[Crim. No. 31806. Second Dist., Div. Four. Sept. 1, 1978.]

In re PATRICK W., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
PATRICK W., Defendant and Appellant.

**COUNSEL**

Jerry D. Whatley and Lonnie B. Springer, Jr., for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JONES, J.\***—A petition was filed in the Los Angeles County Juvenile Court alleging that Patrick W., 13 years of age, was a minor coming within the provisions of section 602 of the Welfare and Institutions Code in that he had committed the crime of murder. The minor appeals from the order of the court sustaining the petition, declaring the minor a ward of the court and committing him to the California Youth Authority.

---

*Assigned by the Chairperson of the Judicial Council.

In February 1977, the minor lived in Acton, California, with his mother, a sister Deanna, age 11, and his stepfather, Edward Bullis, a Los Angeles police officer, who had married the minor's mother in 1973. Patrick and his stepfather did not get along well together, had often quarreled, and on some occasions there had been physical mistreatment of the boy by his stepfather. The mother worked in Los Angeles and was away from home much of the time.

On the afternoon of February 22, 1977, Deanna complained to her stepfather that the minor had fought with her and had caused her to cry. The stepfather became so angry that he choked the minor into unconsciousness. On the following day the minor got his stepfather's rifle and loaded it while both parents were gone, telling his sister that he wanted to kill the stepfather, but then he "chickened out" and put the rifle away before Mr. Bullis came home. On the next day, however, after the parents had left, the minor told his sister to stay home from school, said he was going to kill Mr. Bullis and again obtained the rifle, loaded it and took a practice shot with it while waiting for the stepfather to return from work. As Bullis arrived home about 5:30 p.m. and started to enter the house through a sliding glass door he was shot fatally in the chest. The minor then took money from the decedent's pocket, buried the body and left home with his sister, spending the night on a hill nearby.

On the following day the minor's school principal received a phone call from a motorist who had picked up the minor and his sister hitchhiking on the freeway. The minor had admitted they were running away from home and the motorist had left them at an off-ramp in Saugus. The principal drove to that location, saw the children and told them he would drive them back to school. The minor was reluctant to get in the car saying that "he just couldn't go back, and he couldn't face his mother" and finally stating that he had shot and buried his stepfather. The minor and his sister were then persuaded to enter the principal's car and he drove them to the school where they were taken into custody by sheriff's deputies. Decedent's body had been discovered in the meantime by Los Angeles police officers who had gone to the Acton home in response to Mrs. Bullis' report that decedent and the two children were missing. The minor's maternal grandparents had also arrived in Acton by the time the body was found. They were told that the two children were being taken to the Antelope Valley sheriff's office in Lancaster for questioning. The grandparents arranged to stay at a motel in Palmdale with the mother that night and informed a sheriff's deputy where they would be. Earlier the grandparents had been told that they would not be able to visit the

minor for a period of 24 hours, although this statement was probably not made by a sheriff's representative but rather by one of the Los Angeles police officers who had gone to the Bullis home voluntarily to help in the search for their fellow officer.

The minor was interviewed by Detectives Rasure and Villarreal at approximately 10 p.m. that night in the Antelope Valley sheriff's station, some three and one-half hours after being taken into custody. After being properly advised of his *Miranda* rights and indicating his understanding of them the minor was asked if he wanted to talk about the case. He replied "I guess, if it's gonna be best." Deputy Villarreal then went on to explain that this was a matter for the minor to decide, that the officers did not want to force him or coerce him in any way and the minor again indicated his understanding. The conversation then continued as follows:

"Q. Okay, and that's why—that's why we ask you if—if you wanted to talk or not?

"A. Yeah.

"Q. Okay. Do you want an attorney or not?

"A. I'm not sure, I'll have to talk to my parents, to my mother, I don't know.

"Q. Okay, do you want to see your mother?

"A. No, not really. Just answer questions whatever you want or—

"Q. You just want to talk about the case, huh?

"A. I guess.

"Q. Get it all out.

"A. What—whatever you want is fine, right."

The minor then made a full and detailed confession of the killing of his stepfather, which was admitted in evidence at the adjudication hearing.

■ The minor now contends that his confession should not have been admitted in evidence because the prosecution failed to show that

there had been a valid waiver of his right against self-incrimination. ■ In the absence of such waivers statements made by a minor while in custody are inadmissible in a juvenile court proceeding under Welfare and Institutions Code section 602. (*In re Roderick P.* (1972) 7 Cal.3d 801 [103 Cal.Rptr. 425, 500 P.2d 1].) Also, a minor's request to see one of his parents when subjected to custodial interrogation is to be construed as an indication that the minor desires to invoke his Fifth Amendment rights and questioning must then immediately cease. (*People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793].)

Although our Supreme Court in *People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202], refused to require an adult's consent as a condition to a minor's waiver of his privilege against self-incrimination, it did state that such consent is to be desired and should be obtained whenever feasible. Whether or not such adult advice was sought and obtained for a minor is a factor to be considered in determining the admissibility of a minor's confession to the police. As the United States Supreme Court stated in reference to a 14-year-old whose confession was held inadmissible: "The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. . . . He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not." (*Gallegos* v. *Colorado* (1962) 370 U.S. 49, 54 [8 L.Ed.2d 325, 328-329, 82 S.Ct. 1209, 87 A.L.R.2d 614].)

■ In the present case the minor indicated uncertainty when asked by the deputy whether he wanted an attorney, saying that he would have to talk to his mother. When asked if he wanted to see her he (understandably) said "No, not really" and stated further, with some encouragement from the form of the officer's question, that he was willing to talk about the incident. At least one of the deputies present (Sgt. Rasure) while the questions were asked knew that the minor's maternal grandparents were with the mother at a nearby motel, a fact apparently unknown to the minor, and also knew that they were greatly concerned

about the minor and his sister. Shortly after the minor had completed his confession telephone arrangements were made with the grandparents to pick up the sister from the sheriff's station, and this was, done. Under these circumstances we perceive no reason for the sheriff's deputies not seeking the presence of the grandparents as responsible adults to counsel with the minor before he was questioned. We think that the recommendation in *People* v. *Lara, supra,* 67 Cal.2d 365, that such procedure be followed comes close to being a mandate when dealing with a 13-year-old boy suspected of murder. The minor had already voiced difficulty in facing his mother, whom he rightly assumed to be highly distraught at the time. If he had been made aware of his grandparents' concern and that they were near there is good reason to believe that he would have sought their advice before responding to the officers' questions.

Also, although the minor showed understanding of the *Miranda* admonitions as explained to him by the deputies he would not, of course, have been likely to fully "comprehend the meaning and effect of his statement" (*People* v. *Lara, supra,* 67 Cal.2d at p. 383): for example, its use in this case to refute an expert's opinion concerning the minor's diminished mental capacity to commit the crime charged. To those who argue that the same thing can be said of an adult whose confession is used against him, the simple answer is that the courts have always given more zealous protection to minors' rights, under both criminal law and civil, because of their relative helplessness when dealing with adults by reason of immaturity. We therefore hold that the minor's confession in the present case was inadmissible on the totality of the circumstances present. Since the admission of a confession obtained in violation of *Miranda* principles constitutes reversible error per se (*In re Michael C.* (1978) 21 Cal.3d 471, 478 [146 Cal.Rptr. 358, 579 P.2d 7]) the order declaring the minor a ward of the court must be reversed. Even without the rule of *In re Michael C., supra,* reversal would have been required because, although there was other evidence admitted which showed that the minor had killed his stepfather, the court relied on the confession in rejecting a claim of the minor's diminished mental capacity.

■ Since a rehearing will be required in this case we address ourselves to the minor's further contentions on appeal that evidence of the circumstances pertaining to the crime should not be admissible to show his knowledge that the act was wrongful when committed, that statements made by the minor in respect to that issue are not admissible and that the court should determine that issue separately before receiving

other evidence on adjudication pursuant to Welfare and Institutions Code section 602.

Penal Code section 26, subdivision One provides that children under the age of 14 years are incapable of committing a crime "in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness." This requirement applies as well to juvenile court proceedings under section 602 of the Welfare and Institutions Code charging the minor with having committed a crime. (*In re Gladys R.* (1970) 1 Cal.3d 855 [83 Cal.Rptr. 671, 464 P.2d 127].)

"Only if the age, experience, knowledge, and conduct of the child demonstrate by clear proof that he has violated a criminal law should he be declared a ward of the court under section 602." (*In re Gladys R. supra,* 1 Cal.3d at p. 867.) To prohibit evidence as to the child's conduct on the occasion in question would often result in omission of the only truly relevant evidence on the subject. In the present case, for example, we would be left with evidence that the minor, 13 years of age, is a bright boy whose mother told him it was wrong to hurt people and that in her opinion the minor knows that it is wrong to shoot another person—hardly the "clear proof" required by Penal Code section 26, subdivision One. Turning to evidence of the minor's conduct on the occasion in question, however, and the two days preceding, there are numerous circumstances which in our opinion were relevant to show that the minor knew the wrongfulness of his act at the time it was committed and collectively satisfy the "clear proof" requirement of section 26, subdivision One.

It should be noted also that the minor himself presented psychiatric testimony on the issue, to the effect that the minor was a victim of transient psychosis at the time of the killing and unaware that his act was wrongful. The doctor's opinion included a consideration of the circumstances surrounding the event, without which such evaluation would be of little or no value. The judge as fact finder rejected the evidence, as he had a right to do. (Pen. Code, § 1127b.) Certainly, however, the apparently intentional killing of his stepfather by a 13-year-old boy is so abhorrent and abnormal that psychiatric evaluation would be essential, and that would necessarily include consideration of and testimony concerning the minor's conduct at the time of the crime charged.

Although most of the above facts were proved by witnesses other than the minor, his declarations can also be considered for the purpose. (*In re Tanya L.* (1977) 76 Cal.App.3d 725 [143 Cal.Rptr. 31].) The case of *In re*

*Michael B.* (1975) 44 Cal.App.3d 443 [118 Cal.Rptr. 685], involving a nine-year-old charged with a burglary of an automobile is not to the contrary, but simply holds that the child's admission that he knew such conduct was wrong was not sufficient by itself to meet the burden of proof under the facts of that case.

Finally, on the Penal Code section 26, subdivision One issue in this case there is no reason to hear and rule on that issue before hearing other evidence on the adjudication issue, since the same evidence of the minor's conduct and declarations would be admissible on each, as stated above. In this respect it is unlike the social study report concerning a minor, which may contain a great deal of legally incompetent background material that might tend to be prejudicial and therefore must be read only after determining the adjudication issue. (See *In re Gladys R., supra,* 1 Cal.3d at pp. 859-862.)

The order is reversed.

Kingsley, Acting P. J., and Jefferson (Bernard) J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 25, 1978. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.