[Crim. No. 31806. Second Dist., Div. Four. Apr. 15, 1980.]

In re PATRICK W., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
PATRICK W., Defendant and Appellant.

COUNSEL

Jerry D. Whatley and Lonnie B. Springer, Jr., for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KINGSLEY, Acting P. J.**—The minor was found by the juvenile court to be a person coming under section 602 of the Welfare and Institutions

Code in that he had committed murder in violation of section 187 of the Penal Code. He was committed to the Youth Authority; he has appealed; we reverse.

The case for the People[1] is that, angry at his father, a police officer, the minor had intentionally shot and killed him. Alerted by school authorities and other persons, deputy sheriffs arrested the minor and took him to the station for interrogation. Admittedly they gave him the formal *Miranda* rights and also asked if he desired to talk to the "parents." Quite understandably, the minor declined to face his mother, whom he had just widowed. ■■■ It is the contention of the minor here that, since his grandparents were available and had sought to speak to the minor, the deputies were under an obligation to ask him if he desired to talk to them and that the deputies had not done so.

This is the second time that this case has been before this court. On September 1, 1978, we held that the order of commitment must be reversed because of that failure. (*In re Patrick W.* (1978) 84 Cal.App.3d 520 [148 Cal.Rptr. 735].) On October 23, 1978, our Supreme Court denied hearing. The People then sought certiorari and, on June 25, 1979, the United States Supreme Court remanded the case to us "for further consideration in the light of *Fare* v. *Michael C.* (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560]."

In *In re Michael C.* (1978) 21 Cal.3d 471 [146 Cal.Rptr. 358, 579 P.2d 7], our Supreme Court had held that a confession obtained from a minor after his request to see his probation officer had been denied, was obtained in violation of the minor's *Miranda* rights. It was that holding which the United States Supreme Court reversed, primarily on the ground that a probation officer, by virtue of his dual allegiance, was not the kind of person on whom a minor was entitled, within the purpose of *Miranda*, to rely.

It is clear that the United States Supreme Court's decision in *Michael C.* rests on facts distinguishable from those before us on this appeal. The grandparents here did not have the official ambivalence that the Supreme Court saw in the *Michael C.* case. They fall more in the group of which our Supreme Court said, in *People* v. *Burton* (1971) 6 Cal.3d 375, at page 382 [99 Cal.Rptr. 1, 491 P.2d 793], "person to

---

[1]Since our former opinion sets forth in full detail the facts of this case, we here give only a summary of them in such detail as is required for this opinion.

whom he [a minor] normally looks" for help.[2] Admittedly there is *language* in the Supreme Court opinion that might be interpreted as indicating that that court would take a similar view of a right to see grandparents. However, in its action in the case before us, the United States Supreme Court did not reverse our judgment on the authority of *Michael C.* but merely directed us to reconsider our opinion "in the light of" that opinion. We have obeyed that direction.

■ It is now well settled that, although a California court must give to a defendant at least as full rights as the Constitution of the United States, as construed by the United States Supreme Court, requires, a California court may, in applying our own state constitutional requirements, afford to a defendant rights greater than those required by the federal Constitution. In the context of this case, a requirement of warnings similar to those required by *Miranda*, were earlier required by the Supreme Court of California. (*People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].)

As we have pointed out below, the California Supreme Court has held that *Miranda* extends to a right to consult with parents; the decision in *Michael C.* does not hold that that interpretation of *Miranda* is federally incorrect.

■ In the present status of this case and of the California decisions, we conclude that it is our duty, as an intermediate appellate court, to follow and apply what we regarded, and still regard, as the applicable California law. If our Supreme Court decides, in light of the language in *Michael C.*, either to overrule or to distinguish *Burton*, it will then face the issue, not here properly before us, of whether it should construe our own state Constitution as requiring, in a California prosecution, the right of consultation herein involved.

The People argue that the minor's confession to the deputies was immaterial since he had, earlier, made a confession to a school official. However, there was a serious issue as to a defense of diminished capacity and the record makes it clear that the confession to the deputies was heavily relied on by the People to rebut that defense. Under those circumstances, as we said in our earlier opinion, the admission of the

---

[2] It is here immaterial to speculate over whether minor would have exhibited the same reluctance to facing his grandparents as he had to facing his mother. The choice was his; he was never given that choice.

confession to the deputies cannot be said, beyond a reasonable doubt, to be nonprejudicial.

The judgment is reversed.

JEFFERSON (Bernard), J.*—I agree with the result and the reasoning set forth in the opinion of Justice Kingsley. However, I would add additional reasons for reaching the result·that the minor's confession was obtained by the police in violation of his constitutional rights.

In the case at bench we are dealing with a 13-year-old minor and he stands in a different light than that of an adult or of an older minor. I have had occasion to express my views of the law on this subject recently, but I feel impelled to reiterate these views in this case now before us.

I

*Any Interrogation of a 13-year-old Minor*
*in the Absence of Counsel Is Invalid*
*Irrespective of Miranda Warnings and*
*an Asserted Waiver Thereof*

I am unable to accept the assumption indorsed by the dissent in the instant case that a 13-year-old minor stands in the position of an adult insofar as the principle of law is concerned that a suspect may waive his constitutional right to remain silent and to have an attorney pursuant to the requirements of *Miranda.* Such a principle of law should have no application to a 13-year-old minor. Irrespective of what the Supreme Court of the United States might hold with respect to the rights of minors under the federal Constitution, I am of the opinion that the California Constitution should be interpreted to preclude the application of a *Miranda* waiver to any minor who is not more than 13 years of age. It is an erroneous assumption to couch a principle of law in terms that such a minor is capable of understanding the constitutional rights involved in the *Miranda* warnings and in holding that he has the capacity to intelligently and knowingly waive such rights.

It is my view that such a waiver of constitutional rights should be held to be impermissible with respect to such a minor. I would interpret the California Constitution to provide that no interrogation by the po-

---

*Assigned by the Chairperson of the Judicial Council.

lice should be permitted of a minor 13 years of age or younger in the absence of counsel. It should be mandatory that an attorney be appointed for any such minor, and that no interrogation of such minor by a police officer be permitted unless there is a waiver by the minor upon advice of counsel appointed for such minor. It is my position that a mandatory appointment of counsel for a minor no more than 13 years of age should be a prerequisite under the California Constitution for the validity of any waiver of the right to remain silent.

I recognize that in some respects the doctrine of *Miranda* has been relaxed, rather than strengthened. Thus, if it is believed that a victim's life hangs in the balance, a defendant may be interrogated about the victim's whereabouts without giving the *Miranda* warnings. "While life hangs in the balance, there is no room to require admonitions concerning the right to counsel and to remain silent." (*People* v. *Dean* (1974) 39 Cal.App.3d 875, 882 [114 Cal.Rptr. 555]; see, also, *People* v. *Modesto* (1965) 62 Cal.2d 436, 446 [42 Cal.Rptr. 417, 398 P.2d 753]; *People* v. *Riddle* (1978) 83 Cal.App.3d 563, 572 [148 Cal.Rptr. 170].) But in the situation presented in the case at bench of a 13-year-old minor, the *Miranda* protection should be strengthened by a mandatory requirement of appointment of counsel before any attempt is made by police officers to secure statements from such a minor. Since no counsel was appointed for the minor in the case at bench, I would hold that the minor's confession should be deemed inadmissible under the appropriate provisions of the California Constitution.

II

*The Totality Approach Set Forth in Fare*
*and Espoused by the Dissent Mandates a*
*Holding That There Was No Waiver of*
*Fifth Amendment Rights*

The dissent sets forth portions of the record to sustain the view that the 13-year-old minor before us made an intelligent waiver of his *Miranda* rights. Even under the principle that a 13-year-old minor has the capacity to waive his *Miranda* rights, including the right of counsel—a rule of law to which I do not subscribe—the record before us does not support the conclusions reached by the dissent. I draw totally different inferences and conclusions from this same record.

The record of the entire conversation between the minor and the officers, which lasted approximately 30 minutes, does *not* "reflect[s] an atmosphere free of intimidation and coercion." On the contrary, this record convinces me that the minor's confession was obtained by "intimidation and coercion." I can see no basis for a holding that the trial judge could reasonably find that the minor made a knowing and voluntary waiver of his *Miranda* rights. In *People v. Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672], the high court established the burden-of-proof rule that when a defendant raises the issue that his confession was involuntary, the burden is upon the prosecution to prove beyond a reasonable doubt that the confession was voluntary as a preliminary fact to the admissibility of the confession.

It is my view that, in the case at bench, the record establishes, as a matter of law, that the evidence is insufficient to support a finding, beyond a reasonable doubt, of a *Miranda* waiver by the minor. The judgment below, therefore, must be reversed, even if *Fare v. Michael C.* (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560], were to be considered as controlling over *People v. Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793], discussed in the lead opinion herein.

**BURKE (M. L.), J.\***—I respectfully dissent. My reading of the decision of the United States Supreme Court in *Fare v. Michael C.* (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560], brings forth but one conclusion: It is an impermissible extension of the *Miranda* rules to reverse the order of commitment of the minor in this case because the officers before questioning him never informed him that his grandparents were nearby and available to talk with him, and never specifically asked him if he wanted to talk to them.

Under the ruling of the court in *Fare v. Michael C., supra,* the question of whether a waiver of *Miranda* rights is free and intelligent—be it a waiver by an adult or one by a juvenile—is to be resolved on the totality of the circumstances surrounding the waiver. Using the court's language in *Fare,* "This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where the interrogation of juveniles is involved." (442 U.S. at p. 725 [61 L.Ed.2d at p. 212].)

*Assigned by the Chairperson of the Judicial Council.

*Fare* v. *Michael C., supra,* involved the refusal of the arresting officers to honor the minor's request to see his probation officer before questioning him. The California Supreme Court, in *In re Michael C.* (1978) 21 Cal.3d 471, 478 [146 Cal.Rptr. 358, 579 P.2d 7], had held that, in the absence of strong evidence to the contrary, when a minor asks for his probation officer, he is invoking his privilege against self-incrimination and questioning must cease until the request is honored. In reversing that decision, the court in *Fare* preliminarily observed: "This Court, however, has not heretofore extended the *per se* aspects of the *Miranda* safeguards beyond the scope of the holding in the *Miranda* case itself. We therefore must examine the California court's decision to determine whether that court's conclusion so to extend *Miranda* is in harmony with *Miranda's* underlying principles." (442 U.S. at p. 717 [61 L.Ed.2d at p. 207].)

The court then reasoned that to permit the extension of the per se aspects of the *Miranda* requirements where the minor's request was to see his probation officer "would impose the burdens associated with the rule of *Miranda* on the juvenile justice system and the police without serving the interests that rule was designed simultaneously to protect. If it were otherwise, a juvenile's request for almost anyone he considered trustworthy enough to give him reliable advice would trigger the rigid rule of *Miranda.*" (*Fare*, 442 U.S. at p. 723 [61 L.Ed.2d at p. 211].)

The court concluded: "We hold, therefore, that it was error to find that the request by respondent to speak with his probation officer *per se* constituted an invocation of respondent's Fifth Amendment right to be free from compelled self-incrimination. It therefore was also error to hold that because the police did not then cease interrogating respondent the statements he made during interrogation should have been suppressed." (*Fare*, 442 U.S. at p. 724 [61 L.Ed.2d at p. 212].)

The lead opinion would limit the applicability of the holding in *Fare* to its bare facts, namely, where there is a request by a minor to see a probation officer. It is asserted that the earlier holdings in the line of California cases culminating in *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793], are still good law and should be followed here under the theory that the California Constitution may be interpreted to afford to a defendant rights greater than those required under the federal Constitution.

However, nowhere in any of those cases do I find any indication whatsoever that the decisions were based on state constitutional requirements. Rather, they refer to the Fifth Amendment and *Miranda*.

In summing up its holding, the court in *Burton* (which the lead opinion relies upon) said: "[W]hen...a minor is taken into custody and is subjected to interrogation, without the presence of an attorney, his request to see one of his parents, made at any time prior to or during questioning, must, in the absence of evidence demanding a contrary conclusion, be construed to indicate that the minor suspect desires to invoke his *Fifth Amendment privilege.*" (Italics added.) (*People v. Burton, supra*, at pp. 383-384.)

And the United States Supreme Court, in *Fare v. Michael C., supra*, 442 U.S. at pages 716-717 [61 L.Ed.2d at page 207], said of the California Supreme Court decision in that case: "We note at the outset that it is clear that the judgment of the California Supreme Court rests firmly on that court's interpretation of federal law."

Not only do all of the cases cited in the lead opinion rely on the United States Constitution, but so do each of the cases on which they are based. Even *People v. Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], decided before *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], is grounded on cases from the United States Supreme Court and the federal Constitution.

A state is free as a matter of its own law to impose greater restrictions on police activity than those which the United States Supreme Court holds to be necessary based upon federal constitutional standards. (*Cooper v. California* (1967) 386 U.S. 58, 62 [17 L.Ed.2d 730, 733-734, 87 S.Ct. 788]; *Sibron v. New York* (1968) 392 U.S. 40, 60-61 [20 L.Ed.2d 917, 933-934, 88 S.Ct. 1889].) However, "a State may not impose such greater restrictions as a matter of *federal constitutional law* when this Court specifically refrains from imposing them." (*Oregon v. Hass* (1975) 420 U.S. 714, 719 [43 L.Ed.2d 570, 576, 95 S.Ct. 1215].) (Italics in original.)

In any event, I still cannot see how *Burton* or any of the cases cited therein provide support for the position taken in the lead and concurring opinions. The minor in the present case never made any request to see his grandparents. By reversing because the officers did not summon

the relatives to consult with the minor before questioning him, notwithstanding that no request was made for their presence, the holding of this case extends *Miranda* beyond the line of cases cited and beyond any decision my research has disclosed.

I believe that the United States Supreme Court, in remanding this case for reconsideration in the light of the *Fare* decision, has in effect directed that this court reconsider its decision using the totality of the circumstances approach enumerated in *Fare*.

The court in *Fare* explained that: "The totality approach permits —indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. . . .

"Where the age and experience of a juvenile indicate that his request for his probation officer or his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination. . . ." (*Fare*, 442 U.S. at p. 725 [61 L.Ed.2d at pp. 212-213].)

Application of the totality approach requires a more detailed statement of the facts than the summary set out in the lead opinion. I quote from the statement of the facts as outlined in the original opinion filed in this case, which is found in *In re Patrick W.* (1978) 84 Cal.App.3d 520, at pages 523-524 [148 Cal.Rptr. 735], as follows: "In February 1977, the minor lived in Acton California, with his mother, a sister Deanna, age 11, and his stepfather, Edward Bullis, a Los Angeles police officer, who had married the minor's mother in 1973. Patrick and his stepfather did not get along well together, had often quarreled, and on some occasions there had been physical mistreatment of the boy by his stepfather. The mother worked in Los Angeles and was away from home much of the time.

"On the afternoon of February 22, 1977, Deanna complained to her stepfather that the minor had fought with her and had caused her to cry. The stepfather became so angry that he choked the minor into unconsciousness. On the following day the minor got his stepfather's rifle and loaded it while both parents were gone, telling his sister that he

wanted to kill the stepfather, but then he 'chickened out' and put the rifle away before Mr. Bullis came home. On the next day, however, after the parents had left, the minor told his sister to stay home from school, said he was going to kill Mr. Bullis and again obtained the rifle, loaded it and took a practice shot with it while waiting for the stepfather to return from work. As Bullis arrived home about 5:30 p.m. and started to enter the house through a sliding glass door he was shot fatally in the chest. The minor then took money from the decedent's pocket, buried the body and left home with his sister, spending the night on a hill nearby.

"On the following day the minor's school principal received a phone call from a motorist who had picked up the minor and his sister hitchhiking on the freeway. The minor had admitted they were running away from home and the motorist had left them at an off-ramp in Saugus. The principal drove to that location, saw the children and told them he would drive them back to school. The minor was reluctant to get in the car saying that 'he just couldn't go back, and he couldn't face his mother' and finally stating that he had shot and buried his stepfather. The minor and his sister were then persuaded to enter the principal's car and he drove them to the school where they were taken into custody by sheriff's deputies. Decedent's body had been discovered in the meantime by Los Angeles police officers who had gone to the Acton home in response to Mrs. Bullis' report that decedent and the two children were missing. The minor's maternal grandparents had also arrived in Acton by the time the body was found. They were told that the two children were being taken to the Antelope Valley sheriff's office in Lancaster for questioning. The grandparents arranged to stay at a motel in Palmdale with the mother that night and informed a sheriff's deputy where they would be. Earlier the grandparents had been told that they would not be able to visit the minor for a period of 24 hours, although this statement was probably not made by a sheriff's representative but rather by one of the Los Angeles police officers who had gone to the Bullis home voluntarily to help in the search for their fellow officer.

"The minor was interviewed by Detectives Rasure and Villarreal at approximately 10 p.m. that night in the Antelope Valley sheriff's station, some three and one-half hours after being taken into custody. . . ."

The interview with the minor was tape recorded and the tape was introduced in evidence and played for the trial court. A transcript of the

tape was also prepared and introduced as an exhibit. The transcript reveals the following questions and answers relevant to the *Miranda* issue:

"Q. Patrick Steven _____ [last name deleted]. How old are you?

"A. 13.

"Q. Okay. I'm gonna write before we start, you know that this interview will be tape recorded?

"A. Yes, I do.

"Q. And the recording is going on now? Okay, I got to give you your Admonition and Waiver of Rights and I'm gonna go very slow so you understand and we understand that you understand each and every right that you have okay?

"A. Yeah.

"Q. Alright. Number 1: That you have the right to remain silent. Anything you say can and will be used against you in a court of law. You know what I said so far?

"A. Yes.

"Q. You understand that you have that right to remain silent, and anything you say can and will be used against you?

"Q. You have the right to talk to a lawyer before we talk to you and to have him present while we talk to you. And if, you know, you don't want an attorney you can have your mother or any, you know, legal guardian with you. You understand that?

"A. Yes.

"Q. Okay. You don't, you know, okay, as long as you understand you can have your mom or an attorney, someone with you to protect your rights. Okay, if you cannot afford to hire a lawyer one will be appointed to represent you before any questioning, free of charge. Do you understand what I've just explained to you?

"A. Yes.

"Q. Okay. With—I know you say yes, and so on, but, tell me what I just told you, okay?

"A. You told me that I don't have to talk to you without my lawyer or my mom or somebody like that.

"Q. Uh-huh.

"A. And I don't—I don't have to answer questions without somebody present.

"Q. Do you want to talk about the case?

"A. I guess, if it's gonna be best.

"Q. Well, that's up—up to you, you know, you have your rights to be protected, you know, you have the rights and so on, and also that—that uh, the reason we explain these things to you is so you know what your rights are.

"A. Uh-huh.

"Q. So, and that's why we ask you that if you can (Unintelligible) that we don't want to force you or coerce you in any form or way.

"A. Yeah.

"Q. You—you understand that?

"A. Yes.

"Q. Okay, and that's why—that's why we ask you if—if you wanted to talk or not?

"A. Yeah.

"Q. Okay. Do you want an attorney or not?

"A. I'm not sure, I'll have to talk to my parents, to my mother, I don't know.

"Q.   Okay, do you want to see your mother?

"A.   No, not really. Just answer questions whatever you want or—

"Q.   You just want to talk about the case, huh?

"A.   I guess.

"Q.   Let it all out.

"A.   What—whatever you want is fine, right.

"Q.   Okay. What we want is just you know, to find out the truth, what happened, you know and that's all, but again, we also want to protect your rights, and that's why we're going through what we have and what we're doing here. Can you scoot up a little bit here so everything (Unintelligible). Okay, then, my partner is Duane Rasure, he's going to be asking you some questions and anything—and at anytime, anytime during this, when we're talking to you, if you don't want to say anything, you just want to quit talking, you tell us okay?

"A.   Uh-huh.

"Q.   You understand that?

"A.   Yes.

"Q.   Okay, and that's at any point?

"A.   Alright.

"Q.   Okay, uh, have you got any—anything there, uh, Duane?

"Q.   RASURE: You said earlier, do you go by the name Patrick?

"A.   Uh-huh.

"Q.   Okay, Patrick, you said earlier that uh, you understand your rights, you knew about all that stuff?

"A.   Yes.

"Q. Where did you learn those kind of things?

"A. From my father.

"Q. He explained to you about right and how—

"A. No.

"Q. This all works?

"A. Well, uh, he gave me a pamphlet, uh, like a card.

"Q. This card that you—I'm sorry go ahead.

"Q. We're talking.

"A. Well, he had many of these cards, and he gave me one and I read my rights and I asked him questions and he explained.

"Q. I see. He has—how long have you lived with him?

"A. Five (5) years.

"Q. Five (5) years. He has taught you a little bit about the law?

"A. A little bit."

The minor then proceeded to tell in detail how he planned and carried out the killing and burial of his stepfather. The interview consumed approximately 30 minutes.

The transcript of the interview with the minor depicts an intelligent, fairly sophisticated, albeit youthful, boy of 13. He told the officers that his stepfather had talked to him about the law, and had answered his questions and explained to him about *Miranda* rights. According to the minor, his stepfather had given him a card containing the *Miranda* rights. The transcript shows that the officers slowly and carefully went over the rights with the minor, and assured themselves that he understood his rights by asking that he explain his understanding of the rights, which he did in an intelligent, knowledgeable fashion. The record of the entire conversation between the minor and the officers, which consumed approximately 30 minutes, reflects an atmosphere free

of intimidation and coercion. Those conditions and circumstances certainly do not lend themselves to the conclusion that the minor was either incapable of understanding or waiving his privilege against self-incrimination.

Considering all of the circumstances, including the fact that the minor had earlier that day, before being taken into custody, confessed to his school principal, I believe the conclusion of the trial judge that the minor understood and waived his privilege against self-incrimination was correct. The minor's confession was therefore properly admitted against him.

I would affirm.

The People's petition for a rehearing was denied on May 1, 1980, and the following opinion was then rendered:

THE COURT.*—As the Attorney General admits in his supplemental brief, both the mother and grandmother had asked the police to see the minor, at a time before his confession was obtained. That the officers to whom they talked, and who refused the request, did not communicate it to the interviewing officer is immaterial.

BURKE (M. L.), J.[†]—I would grant rehearing for the reasons set forth in my dissent.

Respondent's petition for a hearing by the Supreme Court was denied June 12, 1980. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.

---

*Before Kingsley, Acting P. J., Jefferson (Bernard), J.,[†] and Burke (M. L.), J.[†]

---

[†]Assigned by the Chairperson of the Judicial Council.