[Crim. No. 21721. Aug. 31, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DARRELL DAVIS, Defendant and Appellant.

**COUNSEL**

Barney Goldstin for Defendant and Appellant.

Quin Denvir, State Public Defender, and Edward Schulman, Deputy State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Gary R. Hahn, William R. Weisman and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

Albert M. Leddy, District Attorney (Kern), and Margaret E. Spencer, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MOSK, J.**—After a jury trial defendant, 16-year-old Michael Darrell Davis, was convicted of the rape and first degree murder of 13-year-old Deboruh Morgan. Because of the victim's age, defendant was also convicted of committing a lewd and lascivious act on a child under the age of 14. Two special circumstances were charged and found to be true. (Former Pen. Code, § 190.2, subds. (c)(3)(iii) and (iv).)[1] Hence defendant, who as a minor is exempt from the death penalty (former § 190.5), was automatically sentenced without a penalty hearing to life imprisonment without possibility of parole. (See former § 190 et seq.)

On appeal, defendant challenges the legality of the police procedures by which his confession was elicited, and asserts a denial of his right to confront an important witness. As will appear we find no constitutional violation in these circumstances, and therefore affirm the conviction. However, we find the sentence of life imprisonment without possibility of parole unauthorized by statute in this case, and therefore reduce the sentence to provide for a term of life imprisonment.

### I

Defendant was convicted primarily on the basis of his confession, which established the following facts: Defendant and the victim were walking in Houghton Park at approximately 5:30 p.m. on September 15, 1978. After repeatedly telling him to leave her alone, the victim hit defendant with her notebook. Defendant became angry, grabbed the victim's hat, and threw it in the bushes. As she went after the hat, defendant followed her into the secluded area and choked her until she was unconscious. He then raped her and, when she started to show signs of regaining consciousness, strangled her because he was still angry and feared she would tell others what he had done.

---

[1]This case arose under the 1977 death penalty statute, since repealed. (Stats. 1977, ch. 316, repealed by Initiative Measure approved Nov. 7, 1978.) Unless otherwise noted, all statutory citations herein refer to the Penal Code, and all citations to former code sections refer to the 1977 statute.

Defendant makes three separate challenges to the admissibility of his confession. ■ He contends the confession was (1) the fruit of an illegal seizure, (2) the fruit of an arrest made without probable cause, and (3) involuntary. The contentions are not persuasive.

Defendant first maintains his transportation to the police station for questioning was a seizure violative of the Fourth Amendment. On September 28, 1978, defendant was telephoned by Officer Collette, a local police detective investigating the murder. The officer asked defendant if he would be willing to arrange a meeting to discuss the incident. Defendant agreed and made an appointment to meet the officer in Houghton Park at 2:30 the next afternoon. Defendant arrived promptly at the appointed time and place accompanied by a friend, apparently from the nearby high school. Because the two officers who met him wished to speak with defendant privately, and because the park was crowded with other students, Officer Collette asked if defendant would be willing to come to the police station for the interview.[2] After a brief discussion with his friend, defendant agreed to go; he did not appear nervous or concerned, according to Officer Collette. En route, defendant and the officers engaged in a friendly conversation about football, and the present crimes were not mentioned. At the station defendant voluntarily spoke with the officers about the incident.

Defendant contends that *Dunaway* v. *New York* (1978) 442 U.S. 200 [60 L.Ed.2d 824, 99 S.Ct. 2248], compels the conclusion that an arrest occurred when he was transported to the police station. In that case, the police had vague suspicions that Dunaway, a teenager, was involved in a robbery. Despite the absence of probable cause, they decided to arrest him. They located him at a neighbor's residence and asked him to accompany them to the station without informing him that he was free to refuse. Although he consented to their request, they were prepared to physically restrain him if he did not cooperate. Without revealing which of these facts it found determinative, the high court held that defendant was thereby seized for purposes of the Fourth Amendment. (*Id.* at p. 207 [60 L.Ed.2d at p. 832].)

The present case is distinguishable on two grounds. First, in *Dunaway* the suspect was not free to leave, although he may have incorrectly assumed he was. The court relied heavily on that fact (see, *id.* at pp. 207,

---

[2]In the course of their investigation of the crime, the police conducted 80 interviews, at least 12 of which took place at the police station.

212, 215, fn. 17 [60 L.Ed.2d at pp. 832, 835, 837]), apparently finding it persuasive proof that the suspect was deprived of his freedom of action.[3] Because the officers candidly admitted they would have not released the suspect had he requested to leave, there was little need to inquire into his perception of the situation.

Here, on the other hand, Officer Collette testified that at the time of the voluntary meeting in the park he did not intend to arrest defendant, who was free to leave if he so desired. Defendant offered no proof that he was restrained or threatened with physical restraint. Consequently, the trial court could justifiably conclude that no actual deprivation of freedom occurred.

Second, defendant was not as likely as the suspect in *Dunaway* to be reasonably convinced that he was deprived of his freedom of action. Some teenagers, when unexpectedly confronted with police who ask to be accompanied to the station, are likely to be intimidated into submission simply by virtue of the sudden and imposing presence of uniformed authority. But this defendant initially spoke to Officer Collette by telephone, and was asked if he would meet with the officers not immediately, but at his convenience. Defendant chose both the time and place of

---

[3] "[C]ustody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived." (*People* v. *Arnold* (1967) 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515]; see also *Miranda* v. *Arizona* (1966) 384 U.S. 436, 477 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].)

Despite the emphasis placed on the evidence of the officers' intent in *Dunaway*, a more recent case, *United States* v. *Mendenhall* (1980) 446 U.S. 544 [64 L.Ed.2d 497, 100 S.Ct. 1870], raises significant doubt regarding the present attitude of the high court toward such evidence. In *Mendenhall*, Justice Stewart, joined by Justice Rehnquist, took the position that in deciding whether a seizure has occurred, the sole determining factor is the reasonable perception of the suspect, the officers' intent being "irrelevant except insofar as [it] may have been conveyed to the [suspect]." (*Id.* at p. 554, fn. 6 [64 L.Ed.2d at p. 509] (opn. of Stewart, J.).) Justices Marshall, Brennan, and Stevens joined Justice White's dissent concluding that the officers' intent to arrest the suspect was important, if not conclusive, evidence of seizure and that Justice Stewart's opinion could not be reconciled with *Dunaway*. (*Id.* at pp. 574-575 [64 L.Ed.2d at pp. 522-523] (dis. opn. of White, J.).) The remaining justices joined in the portion of Justice Stewart's opinion upholding the trial court's finding that the suspect voluntarily accompanied the officers and was not then under arrest despite evidence of the officers' readiness to restrain her if necessary. Nevertheless, in an opinion by Justice Powell, they expressly declined to take a position regarding Justice Stewart's exclusive focus on the suspect's reasonable perceptions. (*Id.* at p. 560, fn. 1 [64 L.Ed.2d at p. 513] (conc. opn. of Powell, J.).) Hence although *Dunaway* is distinguishable from the case at bar on the basis of the officers' intent, it is unclear whether the United States Supreme Court continues to view the distinction as a significant factor in determining when or whether the suspect is in custody.

the meeting. In the interim, he had ample time to consider what he would say, to anticipate what the police would ask, to consult with parents or others, or to cancel the appointment altogether. Even a person inexperienced with law enforcement, like defendant, would find it implausible that officers who intended to arrest him would call in advance and ask him to name a convenient time and place for that purpose. Consequently, defendant had little reason to believe the officers intended to place him in custody, and the trial court was justified in concluding that defendant was not actually in custody until later in the investigation.[4] (Cf. *People* v. *Butterfield* (1968) 258 Cal.App.2d 586, 590 [65 Cal.Rptr. 765].)

■ Defendant next contends the police lacked probable cause to arrest him at the time they informed him he was under arrest. A review of the information possessed by the police at that time supports the trial court's ruling that the arrest was valid.

The officers were aware that the victim had been strangled and apparently raped in the park sometime on the evening of September 15. They had found the victim's shoes, pants, and a notebook containing several names and addresses in the bushes some 100 yards from the body of the victim.

Suspicion focused on defendant, who attended the high school adjacent to the park, when a schoolmate informed the police that he saw defendant and the victim walking in the park on the evening of the 15th at approximately 5:30. He reported that the victim and defendant were arguing, and that the victim repeatedly told defendant to get away from her. He saw the victim hit defendant with an object he could not identify. The witness then left the area of the park, where defendant and the victim remained. This information was partially corroborated by another witness who told the police that she saw a female and a male, generally fitting defendant's description, arguing in the park about 5:30 p.m. She heard the female angrily exclaim, "Get away from me, get away. You play too rough." Although the witness was not able to posi-

---

[4]Defendant makes the additional claim that his transportation and subsequent questioning were not justifiable under the standards relevant to temporary detentions. (See *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957].) *Dunaway* clearly implies, however, that those standards are inapplicable to cases in which the suspect is transported to the police station for questioning. (*Id.* at pp. 208-213 [60 L.Ed.2d at pp. 832-836].) Hence, the police must either show that the suspect is not in custody at all or that he is validly under arrest, and defendant's proferred discussion of the middle-ground temporary detention standards is inapposite.

tively identify the male from the high school yearbook, when defendant's picture was pointed out to her she said it was the one that most resembled the person she had seen.

Two other witnesses reported that they saw the victim walking with a male in the vicinity of the park at roughly the same time, but one was unable to give any further description of the male, and the other gave a description somewhat inconsistent with defendant's appearance.

Upon defendant's arrival at the police station, the officers informed him of his *Miranda* rights, but he expressed his willingness to talk. He told them he knew the victim and had been walking through the park with her about 5:30 on the evening of her death. He described her clothing and revealed knowledge of the contents of her notebook. He denied, however, that they had argued or that the victim had hit him. He also declined to take a lie detector test. At this point, officer Collette informed him he was under arrest.

The above facts constitute a substantial evidentiary basis for the trial court's conclusion that probable cause was established. Defendant's admission that he was with the victim at the approximate time of her death, the inconsistencies between his story and those of the other witnesses, and the evidence that he had been arguing with and possibly harassing the victim, could engender in a person using ordinary care a strong suspicion that defendant had committed the crime. (See *People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632], and cases cited.)

■ Defendant further contends that despite his waiver of *Miranda* rights at the commencement of questioning and just before his tape-recorded confession, that confession was both obtained in violation of state constitutional standards set forth in *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108], and involuntary in the traditional sense. (See *Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205]; *People* v. *Jimenez* (1978) 21 Cal.3d 595, 602-605 [147 Cal.Rptr. 172, 580 P.2d 672].)

Defendant arrived at the police station at approximately 3 p.m. He was informed of his rights, asked if he understood them and if he would nevertheless speak with the officers. In addition he was asked, "Do you understand that you don't have to talk to us if you don't want to?" After answering all three questions "Yes," defendant spoke with the of-

ficers for an hour, furnishing them with the information discussed above on the basis of which they then arrested him. Defendant was then requested to take a lie detector test, and initially refused. When he subsequently agreed to do so, he was taken to another room and left alone with the administrator of the test. The administrator read defendant his rights again, and defendant acknowledged that he understood them. When asked whether he wished to talk to the administrator, however, defendant sat silently staring at the floor. He maintained that posture while he was asked several other questions, and spoke only once to assert that he did not want to answer the question, "Did you deliberately kill [Deboruh Morgan]?" He was returned to the investigating officers, who were informed that he had failed to respond to questions and had thereby frustrated the effort to administer the test. The officers resumed questioning, and defendant reiterated his earlier statements.

At 6 p.m. the interrogation was terminated, and defendant was taken to his cell and left alone momentarily. Officer Collette then returned and asked defendant if he wished to have dinner. Defendant appeared sullen, but replied "Yes." Collette then asked, "Do you want to tell me the truth, Michael?" Defendant answered "Yes." Collette inquired, "Did you kill Deboruh Morgan?" and defendant nodded affirmatively.

Thereafter defendant was returned to the interrogation room. After again being informed of his *Miranda* rights he made a full confession, then repeated it on tape. At the end of the tape defendant responded affirmatively when asked if his statement was freely and voluntarily given.

From the totality of the circumstances, the trial court concluded that defendant did not assert his right to remain silent, and had willingly confessed. Despite our sensitivity to the youth and inexperience of defendant, on an independent examination of the record (see *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74]) we conclude the trial court did not err.

First, defendant's failure to respond when asked if he would speak to the polygraph administrator does not appear from the circumstances to have been a general assertion of his right to remain silent. The absence of an express waiver does not in itself establish that the right has been invoked. (*North Carolina* v. *Butler* (1979) 441 U.S. 369, 375-376 [60 L.Ed.2d 286, 99 S.Ct. 1755]; *People* v. *Johnson* (1969) 70 Cal.2d 541, 558 [74 Cal.Rptr. 889, 450 P.2d 265], disapproved on another point in

*People* v. *DeVaughn* (1977) 18 Cal.3d 889, 899, fn. 8 [135 Cal.Rptr. 786, 558 P.2d 872].) Moreover, although defendant's subsequent silence was clear evidence of his unwillingness to speak to the test administrator, the surrounding circumstances show that his reluctance was related only to the polygraph examination. Defendant initially refused to take the test; at the same time, however, he showed no hesitation to speak with the interrogating officers about all aspects of the case. In answering the test administrator's questions only with silence, defendant continued to demonstrate his reluctance to cooperate in the administration of the test. He did not thereby assert that he was generally unwilling to discuss the case, but only that he was unwilling to submit to the scrutiny of the lie detector, a mechanical device. At the hearing to exclude the confession, defense counsel asked defendant, "Did you tell the polygraph man that you didn't want to take the test?" Defendant responded, "Yes." But when asked, "Did you tell him that you didn't want to talk about the case?" he said, "No."

*People* v. *Pettingill, supra*, 21 Cal.3d 231, 242-245, requires that all questioning cease after a suspect asserts his right to remain silent. *Pettingill* remains the law of California and we faithfully adhere to it. But because, under the facts of this case, defendant did not explicitly make that assertion, and by his behavior implied only an unwillingness to submit to a separate and distinct type of mechanical examination, apparently to him more sinister and less comprehensible than that in which he had already voluntarily participated, resumption of questioning was not prohibited by *Pettingill*. Hence the officers were justified in making the assumption, which proved to be accurate, that defendant was still willing to converse with them after the attempt to administer the lie detector test failed.

Second, defendant's confession appears to have been the product of his own volition, and not of official pressure or coercion. Although defendant was a minor, that fact alone does not establish that his confession was involuntary. (*People* v. *Lara* (1967) 67 Cal.2d 365, 378-379 [62 Cal.Rptr. 586, 432 P.2d 202].) The evidence tended to show that he was fully aware of his rights, and was not frightened into submission by the officers' behavior. In fact, it appears he was attempting to use the situation to his own advantage by pretending to cooperate fully and by forthrightly admitting his contact with the victim on the evening of her death to bolster his credibility in asserting his innocence. According to Officer Collette, when defendant was accused of the crime he argued that "if he had killed her he wouldn't have volunteered to

meet me in the park in the first place and, secondly, he wouldn't have come down to the police station with me." Defendant also assured the officers he had "nothing to hide." Furthermore, he expressed no desire to contact an attorney or his parents, and had not told his parents of the appointment, apparently because he did not want them to know of his predicament. (Compare *People* v. *Burton* (1971) 6 Cal.3d 375, 382 [99 Cal.Rptr. 1, 491 P.2d 793]; *In re Patrick W.* (1978) 84 Cal.App.3d 520, 524-525 [148 Cal.Rptr. 735].) Although the preferable practice is to seek the consent of a responsible adult before questioning a minor (*People* v. *Lara, supra,* 67 Cal.2d at pp. 378-379), the failure to do so under the circumstances of this case did not render defendant's statement involuntary.

The precise manner in which the confession was elicited is somewhat troubling, but does not compel a finding of involuntariness. Officer Collette testified that he first asked defendant if he wanted dinner, then asked if he would like to tell the truth. Although the point was not raised at trial or on appeal, the sequence of questions conceivably could have implied to defendant that only if he confessed would he be given food. A confession obtained in that manner would obviously be involuntary. (See *People* v. *Jimenez, supra,* 21 Cal.3d 595, 611, and cases cited; *People* v. *Gordon* (1978) 84 Cal.App.3d 913, 924-925 [149 Cal.Rptr. 91].) Defendant testified, however, that Officer Collette spoke of matters unrelated to the crime between the mention of dinner and the question that ultimately evoked his confession. He also testified that he did not confess because he believed otherwise he would be deprived of food. Moreover, the officers had earlier given defendant a carton of milk, thus demonstrating that they did not intend to withhold food as a coercive tactic.

Viewing the disputed facts in the light most favorable to the prosecution (see *People* v. *Jimenez, supra,* 21 Cal.3d 595, 609), we agree with the trial court that the confession was voluntarily given.

■ .At trial, the prosecutor was allowed to introduce the preliminary hearing testimony of Iona Ete, the witness who originally implicated defendant, because efforts to locate him had been fruitless. Defendant contends the district attorney failed to make an adequate showing of due diligence in establishing the unavailability of the witness for trial. (Evid. Code, § 1291; *Barber* v. *Page* (1968) 390 U.S. 719, 724-725 [20 L.Ed.2d 255, 259-260, 88 S.Ct. 1318].) The contention is without merit.

Ete left school in the area and was reportedly in Samoa, although one source informed the authorities he had returned to California and was living in San Francisco. The prosecution searched for his address at both locations and interviewed family members, searched school records, and examined probation and police records, but could not locate him. The trial court committed no error in ruling these efforts sufficient.

## II

The next issue is whether defendant's sentence of life imprisonment without possibility of parole is legally authorized.[5]

Former section 190 et seq. authorizes imposition of the death penalty in certain first degree murder cases. Since 1921, however, it has exempted minors from that extreme sanction. (Former § 190, as amended by Stats. 1921, ch. 105, § 1; former § 190.1, enacted 1957, repealed by Stats. 1973, ch. 719, § 3; former § 190.3, subd. (a), enacted 1973, repealed by Stats. 1977, ch. 316, § 10; former § 190.5; present § 190.5, enacted 1978.) Although the statute does not also explicitly exempt minors from the sentence of life imprisonment without possibility of parole, neither the language nor the history of the statute supports an interpretation that would authorize imposing that harsh penalty on persons under 18.

The relevant statutory provisions are equivocal. The first provision, former section 190, sets out the permissible penalties for first and second degree murder.[6] The second, former section 190.1, is the

---

[5]Because a recent decision of the Court of Appeal, *People* v. *Superior Court (Reed)* (1979) 98 Cal.App.3d 39 [159 Cal.Rptr. 310], held that minors can be charged with special circumstances and sentenced to life imprisonment without possibility of parole, defense counsel conceded at trial and on appeal that his client was properly sentenced. But the imposition of a sentence for which there is no statutory authority is jurisdictional error (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 16 [9 Cal.Rptr. 607, 357 P.2d 839]); hence if such an error comes to our attention in a case pending before us, it is subject to correction. (*People* v. *Serrato* (1973) 9 Cal.3d 753, 763 [109 Cal.Rptr. 65, 512 P.2d 289] and cases cited; *People* v. *Zubia* (1975) 49 Cal.App.3d 301, 303, fn. 1 [122 Cal.Rptr. 926].)

[6]The 1977 act authorized three penalties for first degree murder—life with possibility of parole, life without possibility of parole, and death. As explained below, in cases involving "special circumstances" the choice is narrowed to the latter two penalties; in all other cases only the first penalty applies.

cornerstone of the remaining provisions of the act, providing an overview of the procedure to be followed in first degree murder cases with allegations of special circumstances possibly justifying the death penalty. Before dictating the proper context and sequence in which the other sections are to be applied, section 190.1 expressly limits its application to cases "in which the death penalty may be imposed pursuant to this chapter ..." and thereby appears to render the subsequent sentencing provisions inapplicable to minors. Yet taken individually, the subsequent sections are not limited to possible death penalty cases. For example, former section 190.1, subdivision (a), authorizes the trier of fact to deliberate on special circumstances charges only if the death penalty may be imposed, while former section 190.4, subdivision (a), imposes no such limitation. Former section 190.1, subdivision (c), likewise restricts its authorization of a penalty hearing to potential death cases, while former section 190.4, subdivision (a), seems to require such a hearing in any case after a conviction of first degree murder with special circumstances. The difference can be explained in one of two ways: either the Legislature intended the limitation to death penalty cases stated in former section 190.1 to apply also to the other sections summarized and organized therein, or it intentionally left open the possibility that the other sections could apply in cases not involving the death penalty.

In resolving the ambiguity, we are guided by well-settled principles of statutory interpretation. ■ "[W]hen language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted. [¶] The defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute." (*In re Tartar* (1959) 52 Cal.2d 250, 256-257 [339 P.2d 553]; see also *People* v. *Superior Court* (*Douglass*) (1979) 24 Cal.3d 428, 435 [155 Cal.Rptr. 704, 595 P.2d 139]; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) ■ Furthermore, when interpreting a statute, if its provisions are unclear, its purpose is paramount: we "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; see also *Tripp* v. *Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749].) The statute should not be read literally if to do so would bring about a result inconsistent with the intent of the Legislature.

(*County of San Diego* v. *Muniz* (1978) 22 Cal.3d 29, 36 [148 Cal.Rptr. 584, 583 P.2d 109]; *Bruce* v. *Gregory* (1967) 65 Cal.2d 666, 673-674 [56 Cal.Rptr. 265, 423 P.2d 193], and cases cited.) Moreover, the statute should be construed as a whole to harmonize any arguably conflicting parts. (*Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 [147 Cal.Rptr. 359, 580 P.2d 1155]; *Erlich* v. *Municipal Court* (1961) 55 Cal.2d 553, 558 [11 Cal.Rptr. 758, 360 P.2d 334].) ■ Finally, "[W]e must, in applying the provision, adopt an interpretation that, consistent with the statutory language and purpose, eliminates doubts as to the provision's constitutionality." (*In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]; see also *Department of Corrections* v. *Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 197, 207 [152 Cal.Rptr. 345, 589 P.2d 853], and cases cited.) ■ These principles all support the conclusion that the statute should not be read to allow the state to imprison a minor for life without possibility of parole.

First and foremost, the history of the statute clearly reveals a specific and limited legislative intent, unrelated to any desire to impose harsher sanctions on minors. Until 1977, the statute provided two alternative penalties for first degree murder—the death penalty and life in prison *with* the possibility of parole. (Former § 190, enacted 1872, as amended by Code Amend. 1873-1874, ch. 508, § 1.) Until 1973, the choice of punishment was left to the discretion of the trier of fact. (*Ibid.*; former § 190.1, enacted 1957, repealed by Stats. 1973, ch. 719, § 3.) As noted above, however, the Legislature has since 1921 immunized minors from the death penalty, thereby fixing their punishment for first degree murder at life imprisonment with the possibility of parole. After the landmark case of *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], established that broadly discretionary sentencing rendered the penalty of death a cruel and unusual punishment, California, like many other states, defined a subcategory of first degree murder cases involving particularly opprobrious "special circumstances" for which the sole possible sentence was death. (Former § 190, enacted 1973, repealed by Stats. 1977, ch. 316, § 4.)[7] Minors were excluded from the operation of the legislation because of their continued exemption from the death penalty.

---

[7]We held in 1972 that the death penalty violated the state constitutional prohibition against cruel or unusual punishment. (*People* v. *Anderson* (1972) 6 Cal.3d 628, 651

Three years later in *Rockwell v. Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101], we struck down the California statute under the mandate of *Gregg v. Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909], and its companion cases, because state law made no accommodation for consideration of mitigating circumstances that might persuade the jury to impose a lesser sentence. In an effort to comply with the strictures of *Gregg* and *Rockwell*, the Legislature amended the death penalty statute in 1977 to provide a separate penalty phase at which the trier of fact could weigh mitigating and aggravating circumstances and impose the sentence of life imprisonment without possibility of parole rather than death in appropriate cases. The urgency clause of that statute (Stats. 1977, ch. 317, § 26) reveals the Legislature's purpose: "The California Supreme Court has declared the existing death penalty law unconstitutional. This act remedies the constitutional infirmities found to be in existing law, and must take effect immediately in order to guarantee the public the protection inherent in an operative death penalty law." Significantly, the Legislature retained unchanged the language exempting minors from the death penalty (former § 190.5), and made not the slightest suggestion that it intended the new penalty to be imposed on minors as an alternative to an ordinary life sentence. Clearly, the Legislature enacted this statute not as a means of increasing the penalty applicable to minors convicted of murder, but solely as a method to ameliorate the unconstitutionally harsh effect of the former death penalty procedures applicable exclusively to adults.[8]

---

[100 Cal.Rptr. 152, 493 P.2d 880].) Shortly thereafter, however, the Constitution was amended, replacing our reading of the prohibition with a fixed interpretation of cruel or unusual punishment authorizing the death penalty by the power of the then-current public will. (Cal. Const., art. I, § 27.)

[8]We have previously recognized the limited purpose of this legislation. In *People v. Teron* (1979) 23 Cal.3d 103 [151 Cal.Rptr. 633, 588 P.2d 773], Justice Tobriner wrote for the court, "exchanges both in the Legislature itself, and between the Legislature and the Governor, abundantly show that the legislation at issue was involved in vitally substantive policy considerations, concerning the appropriateness of enacting criminal measures authorizing *anew* the imposition of capital punishment in California .... [¶] ... The Legislature set out to enact a new death penalty statute, thereby increasing the penalty for those first degree murders in which it believed death might be an appropriate sanction." (*Id.* at pp. 117-119.) In his concurring opinion (*id.* at p. 120) Justice Richardson agreed, stating, "The 1977 legislation ... was enacted to remedy the defects in the 1973 statute." Justice Clark in dissent also acknowledged that the 1977 legislation introduced the penalty of life imprisonment without the possibility of parole "Because mandatory death penalty statutes were declared unconstitutional ...." (*Id.* at p. 125.)

Second, a contrary interpretation would lead to the anomalous requirement of a superfluous penalty hearing whenever a verdict of guilt with special circumstances is returned against a minor. As noted above, former section 190.4, subdivision (a), requires that whenever a defendant is found guilty of first degree murder and a special circumstance charge is found true, "there *shall* be a separate penalty hearing ...." (Italics added.) But because they are exempt from the sanction of death, minors found guilty of special-circumstance murder would be subject to only one penalty, life without possibility of parole; thus a separate penalty hearing, though required by the letter of the law, would be unnecessary, inappropriate and a palpable waste of judicial resources. Hence, the omission of any exception to the mandatory language of former section 190.4, subdivision (a), further demonstrates the absence of legislative intent to provide life without parole as a sentencing alternative except in those cases to which the death penalty might also apply.[9]

Third, when the statute is read as a whole, it offers no basis for charging minors with special circumstances. As noted above, former section 190.1 authorizes disposition of a charge of special circumstances only in possible death penalty cases. And although former section 190.4 contains the same authorization without the restriction, application of that section to minors leads by its own operation to the requirement of a meaningless penalty hearing, as we have just discussed. Moreover, because former section 190.1 can be viewed as a preface to the following sections, stating the context in which they are to be applied, the Legislature may have concluded that repetition of its limitation in each subsequent section would be surplusage. Hence, viewed in context, the language of former section 190.4 authorizing determination of special circumstances charges is properly restricted to cases involving adults charged with first degree murder and subject to the death penalty.

Finally, if the Legislature had intentionally and substantially increased the maximum penalty that could lawfully be inflicted on

---

[9]The court in *People v. Superior Court (Reed), supra,* 98 Cal.App.3d 39, 48-49, when faced with the same potentially absurd result, chose to give no effect to the portion of former section 190.4 requiring a penalty phase as applied to minors, while accepting without question the proposition that minors are subject to charges of special circumstances under other language in the same section. For the reasons stated in the text, and because the *Reed* decision untenably dismisses one part of former section 190.4 to make rational its broad application of another, we disapprove of that case to the extent that it is inconsistent with our present holding.

minors, we would have expected it to express its purpose clearly and set out the appropriate procedures in detail.[10] Instead, we review a statute unclear in its effect on the penalty applicable to minors, silent regarding appropriate procedures by which the new penalty would be imposed on them, and devoid of evidence of any legislative intent to depart from the status quo. Consequently, the ambiguity must be resolved in defendant's favor by finding no authority for charging minors with special circumstances.

The judgment is reversed insofar as it relates to penalty, and we affirm the judgment in all other respects. We order that defendant's sentence be reduced to life imprisonment, the only alternative sentence authorized by the applicable statute. (Former § 190.)

Tobriner, J., Newman, J., and Kingsley, J.,* concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the majority opinion to the extent that it affirms defendant's conviction of first degree murder, rape and the commission of a lewd and lascivious act on a child under the age of 14. I respectfully dissent, however, from the majority's reversal as to penalty. A careful review of the applicable statutes convinces me that defendant properly was sentenced to life imprisonment without the possibility of parole.

The 1977 act at issue here commenced with former Penal Code section 190, which unambiguously stated that *"Every person* guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in state prison for life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5 . . . ." (Italics added; further

---

[10]The amount of time actually spent in prison is vastly increased in the ordinary case if the possibility of parole is eliminated. According to amicus public defender, on average, parole is granted to a convict serving a life sentence after 11-1/2 years. But a minor would conceivably spend 60 or more years in prison without hope of release on a true life sentence. Furthermore, the difference in time is less significant than the difference in effect on the human spirit. "Life in prison [without the possibility of parole] is unique, . . . and it . . . differs in kind from all other, lesser sentences of imprisonment, including a sentence of life imprisonment with a fixed parole-eligibility date." (*Rogers v. Britton* (E.D.Ark. 1979) 476 F.Supp. 1036, 1040.) This is particularly true if the person on whom it is inflicted is a minor, who is condemned to live virtually his entire life in ignominious confinement, stripped of any opportunity or motive to redeem himself for an act attributable to the rash and immature judgment of youth.

*Assigned by the Chairperson of the Judicial Council.

references to § 190 et seq. are to the now repealed provisions of the 1977 act.) Children 14 years of age or older are deemed "persons capable of committing crimes." (Pen. Code, § 26.) It is, therefore, clear that the act was intended to apply to such persons, except as provided in the specified succeeding sections of that act to which I now refer.

Section 190.1 provided that "A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases," namely, the guilt (including special circumstances), sanity and penalty phases. The penalty phase "shall be conducted in accordance with the provisions of Sections 190.3 and 190.4." (§ 190.1, subd. (c).)

Section 190.2 recited that "The penalty for a defendant found guilty of murder in the first degree shall be *death or confinement in the state prison for life without possibility of parole in any case* in which one or more ... special circumstances has been charged and specially found, in a proceeding under Section 190.4, to be true: ..." (Italics added.) Thus, under the 1977 act, in *any* case where first degree murder is accompanied by the requisite special circumstances, the penalty *shall* be death or life imprisonment without parole. There is no provision whatever for a life-with-parole sentence in such a case.

Section 190.3 repeated the foregoing limited choice of punishment alternatives, providing that "If the defendant has been found guilty of murder in the first degree and a special circumstance has been charged and found to be true, ... the trier of fact shall determine whether the penalty shall be *death or life imprisonment without possibility of parole.*" (Italics added.) The section further listed the various factors to be considered by the trier of fact in making its penalty determination.

Section 190.4 set forth various procedures applicable during the guilt, sanity and penalty phases provided for in section 190.1. One of its provisions is noteworthy here: Under subdivision (a), if the jury finds the defendant guilty but fails to reach a unanimous verdict on the special circumstances charge, a new jury is selected to retry that issue. If the new jury likewise fails to reach a unanimous verdict, "the court shall dismiss the jury and impose a punishment of confinement in state prison *for life.*" (Italics added.) This provision represented *the sole authorization* under the 1977 act for imposing a sentence of life imprisonment *with* possibility of parole. Nowhere in the act is there any suggestion that a straight life sentence would be appropriate under any

circumstance other than a failure to find the requisite special circumstance.

Finally, section 190.5 exempted two classes of offenders from the penalty of *death*: (1) persons under the age of 18 at the commission of the crime (subd. (a)), and (2) persons who were "principals" in the capital offense but were not personally present during its commission and did not "intentionally physically" aid or commit the acts causing death (subd. (b)). Subdivision (a) stated that "Notwithstanding any other provision of law, *the death penalty* shall not be imposed upon any person who is under the age of 18 years at the time of commission of the crime." (Italics added.) Notably absent from subdivision (a) was any exemption from the mandatory *alternative* penalty (§§ 190.2, 190.3) of life imprisonment without possibility of parole.

Thus, briefly summarizing the pertinent aspects of the 1977 act, (1) "every person" found guilty of first degree murder shall suffer death, life imprisonment without possibility of parole, or life imprisonment with possibility of parole, "as provided" in the provisions of the act itself (§ 190); (2) where special circumstances are found to exist, the penalty shall be death or life imprisonment *without* possibility of parole (§§ 190.2, 190.3); (3) where special circumstances are not found, the penalty shall be life *with* possibility of parole (§ 190.4); and (4) persons under 18 when the offense was committed are exempt *from the death penalty* (§ 190.5). To me, the conclusion is simply inescapable that persons under 18 when the offense was committed are *not* exempt from a life-without-parole sentence; indeed, if they are convicted of first degree murder with special circumstances, they are *automatically* subject to that penalty. (Accord, *People* v. *Superior Court* (*Reed*) (1979) 98 Cal. App.3d 39, 44-49 [159 Cal.Rptr. 310].)

In the present case, defendant was found guilty of first degree murder *with special circumstances*, having molested, raped and strangled to death a 13-year-old girl. (See § 190.2, subd. (c)(3)(iii)-(iv).) The majority orders defendant's sentence "reduced to life imprisonment, the only alternative sentence *authorized by the applicable statute* (Former § 190.)" (*Ante*, p. 832, italics added.) Yet as we have seen, a straight sentence of life imprisonment was "authorized" only where special circumstances were not found to exist (§ 190.4). Section 190 by itself did not "authorize" any penalty whatever, but merely referred to succeeding sections of the act for the determination of such penalty.

The majority likewise errs in its reliance upon section 190.1. Far from being a "cornerstone" of the act which "limits" its application to cases in which the death penalty may be imposed (*ante*, pp. 827-828), the section merely outlined the various phases of capital cases. Nothing in section 190.1 limited, or otherwise involved, the various penalties which are prescribed for first degree murder.

The majority's recitation of legislative history is similarly unproductive (see *ante*, pp. 829-830), disclosing only an intent to exempt minors from *the death penalty*. That intent was made manifest, of course, by the adoption of section 190.5.

Finally, the majority expresses concern over "the anomalous requirement of a superfluous penalty hearing whenever a verdict of guilt with special circumstances is returned against a minor." (*Ante*, p. 831.) The argument is a hollow one, based upon a patently false premise. Obviously, the sole purpose of the penalty hearing described in section 190.4 is to determine whether death or life without parole should be imposed. As minors such as defendant are exempt from the former penalty, the latter may be automatically imposed without the necessity of further hearing, with its "palpable waste of judicial resources." (*Ibid.*)

Thus, the statutory scheme before us clearly authorized the imposition of life imprisonment without parole in the present case, subject to the Governor's power to grant a pardon or commutation (Cal. Const., art. V, § 8; Pen. Code, § 4800 et seq.) in an appropriate case.

I would affirm the judgment in its entirety.

Fainer, J.,* concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I agree with my colleague, Justice Mosk, that a minor cannot be legally sentenced to life imprisonment without the possibility of parole. However, I cannot agree with his interpretation of the requirements of *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108] and *Dunaway* v. *New York* (1979) 442 U.S. 200 [60 L.Ed.2d 824, 99 S.Ct. 2248] as they apply to this case. *Pettingill* requires that "'custodial interrogation wholly cease when the suspect indicates in *any manner* that he wishes to exercise his Fifth Amendment privilege.'" (*Pettingill, supra*, at p. 239,

---

*Assigned by the Chairperson of the Judicial Council.

quoting *People* v. *Ireland* (1969) 70 Cal.2d 522, 535 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]. (Italics added.) It is, indeed, sad to see the author of the fine opinion in *Pettingill* begin a full-scale retreat from the principles enunciated in that case.