Filed 3/13/15  P. v. Dunlap CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059899 |
| v. | (Super.Ct.No. INF10001831) |
| RASHEED DUNLAP, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dale R. Wells, Judge. Affirmed with directions.

Law Offices of David R. Greifinger and David R. Greifinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Rasheed Dunlap appeals after he was convicted by a jury of attempted robbery and possession of marijuana in a quantity greater than 28.5 grams. He contends that the evidence was insufficient to support the quantity element as to the marijuana possession offense. He also complains that the term of his probation restricting him from owning or possessing firearms or deadly weapons is vague (leaving him to guess the limits of the restriction) and overbroad, because it purports to extend beyond the period of probation. The People concede that the weapons restriction should be confined to the period of probation. Otherwise, however, we disagree with defendant's contentions and we affirm.

FACTS AND PROCEDURAL HISTORY

Adam Ekstrom was an agent for the federal Bureau of Alcohol, Tobacco and Firearms (ATF). In 2009, agent Ekstrom was working with other federal and local law enforcement officers on a joint task force concerned with, among other things, gangs, violence, and gun trafficking.

Ekstrom, posing as a person interested in buying guns, used a confidential informant called "Spanky" to arrange a meeting with defendant on November 10, 2009, about a proposed gun purchase. A few days later, defendant left a telephone message for Ekstrom, saying, "I [got] them things for you [*sic*]." Ekstrom construed the message to mean that defendant had obtained some rifles that he and defendant had discussed at their earlier meeting. Ekstrom spoke to defendant on the telephone later the same evening, November 14, 2009. Defendant said that he had two AK-47 rifles that he would sell for

2

$1,100 each.  Defendant also expressed some apprehension about dealing directly with Ekstrom; he preferred to deal with Spanky instead.

On November 17, 2009, Ekstrom arranged to meet with defendant in the parking lot of a coffee bar to make the exchange.  Sometime after about 2:30 p.m., Ekstrom asked defendant to send a picture of the guns to his mobile telephone, and Ekstrom would show defendant a picture of the money, to establish mutual trust.  At approximately 4:00 p.m., defendant sent a message to Ekstrom, saying he had "them things," and asking Ekstrom to call him.  Defendant then telephoned Ekstrom to say that he was about two hours away; Ekstrom responded that they were "done."  Defendant called back almost immediately, saying he was really only 30 minutes away.  Ekstrom told defendant that he would leave if defendant did not arrive by 5:00 p.m.

Ekstrom and another informant, "Rich," waited in a truck in the parking lot. Attached to the key chain of the truck's ignition keys was a recording device, which proceeded to record the exchange between defendant and Ekstrom.  At approximately 5:00 p.m., defendant arrived in the company of Kory McNear.  Defendant approached Ekstrom's truck.  Ekstrom showed defendant a bundle of $100 bills, which he had folded and placed inside the cellophane wrapping on the outside of a box or pack of cigarettes; Ekstrom then tucked the cigarette box under his leg on the seat of the truck.

Ekstrom and defendant had a short discussion; then defendant consulted with McNear at the back of the truck.  Defendant came back to Ekstrom's window.  He demurred, saying that Rich looked like a cop.  Defendant also showed Ekstrom a picture

3

of an AR military-style assault rifle. This was different from the AK-47 rifle that Ekstrom and defendant had discussed earlier. Defendant told Ekstrom that he had one AR rifle and one AK-47 rifle, and showed pictures of the AR rifle on his mobile telephone.

Abruptly, defendant said, "Man, f*** y'all." Ekstrom responded, "F*** out of here." Defendant then lunged his upper body through the open window and grabbed at the cigarette box under Ekstrom's leg. As he and Ekstrom struggled, defendant managed to rip the top off the cigarette box, but he did not succeed in getting the money. Ekstrom cried out, "they just tried to rob us, they just tried to rob us." Defendant ran away, and Ekstrom gave chase. Defendant climbed over a 10-foot fence and got away.

Other officers who were parked nearby, and who were monitoring the broadcast from the recording device inside Ekstrom's truck, jumped out of their vehicle and chased defendant and McNear. Agent Akil Davis of the Federal Bureau of Investigation (FBI) chased and caught McNear. Investigator Charles Cervello, of the Riverside County District Attorney's office, pursued defendant, but was unable to catch him.

Task force officers later executed a search warrant at defendant's apartment. They found Florida identification cards for defendant inside the apartment. Two bags of marijuana were found in a kitchen cupboard and eight smaller baggies of marijuana on a different shelf in the kitchen. They also found digital scales and $377 in cash, in small denominations. The officers did not find any weapons. The officers took photographs of several of the items found in defendant's apartment, including the marijuana in baggies.

4

As a result of these events, defendant was charged with attempted robbery, possession of marijuana for sale, and attempted grand theft. Defendant was found in Florida several months after the incident, and extradited to California for trial.

A jury found defendant guilty of attempted robbery (count 1), and guilty of a lesser included misdemeanor offense of possession of marijuana in an amount greater than 28.5 grams (count 2). The jury acquitted defendant of the greater offense in count 2, of possession of marijuana for sale, and of any charge (attempted grand theft, attempted petty theft) in count 3.

At sentencing on September 16, 2013, the trial court imposed and suspended imposition of the middle term of two years in state prison for the attempted robbery. The court placed defendant on 36 months supervised probation. One of the terms and conditions of defendant's probation was that he not "knowingly own, possess or have under his control any firearm, deadly weapon, ammunition or related paraphernalia, for life." Defendant objected at sentencing to the phrase, "related paraphernalia," contending that it was overbroad and vague. The trial court overruled the objection and declined to strike that portion of the probation condition.

Defendant filed a timely notice of appeal.

## ANALYSIS

### I. The Evidence Was Sufficient to Establish the Quantity of Marijuana

### as Greater than 28.5 Grams

Defendant first contends that his conviction for possession of more than 28.5 grams of marijuana was not supported by the evidence, because, he asserts, there was no direct testimony about the total weight of all the marijuana found in defendant's apartment. The contention is without merit.

One of the investigating officers, Charles Cervello, who was an investigator for the Riverside County District Attorney's office, testified about the two larger bags of marijuana and the four smaller baggies of marijuana that were found on different shelves in defendant's kitchen. Each of the items of evidence was identified from photographs taken in defendant's apartment depicting the items where they were found. As to the two larger bags of marijuana, the investigator testified that the bags were gallon-size Ziploc bags, that the bags had been weighed, and, although he did not remember the exact amount in each, it was "about an ounce of weed." He said, "This is not an exact ounce of weed. Depending on the quantity or quality, it would be [valued from about $170] to up to $300." The smaller baggies each weighed approximately two grams. "Some were more or less. Those could be resold from [$20] to $40."

6

On cross-examination, defense counsel inquired about the factors that led the investigator to the opinion that the marijuana was possessed for sale. Among the factors that could be considered were the method of packaging, whether there were materials for dividing the material into smaller quantities (such as scales and additional packaging), the presence of pay-owe sheets, the existence of text or phone messages, quantities of cash in small denominations, and other matters. Defense counsel asked, "You told me that one of the factors was the weight; right?" The investigator agreed. Counsel then asked, "So the two one-ounce bags of marijuana were what [led] you to the four little baggies you found in the place; right?" The investigator again agreed.

The jurors submitted questions to the court about the small baggies of marijuana, essentially asking to verify the amounts in the smaller baggies. The investigator was recalled to clarify the matter. He testified that the small baggies contained typical amounts sold for $20 or $30. Although each small baggie contained slightly different amounts, each was approximately two grams. One weighed 2.2 grams, another weighed 2.0 grams, and a third weighed 1.8 grams.

It is clear from the testimonial evidence—questions and answers—that the two larger bags of marijuana each weighed approximately one ounce. The investigator also gave specific weights for three of the smaller baggies of marijuana. The jury also had before it documentary evidence—the photographs of the larger bags and the baggies depicting them in situ. We can also take judicial notice of the official measurement that

7

one ounce is the equivalent of 28.35 grams.[1]  The jurors could see the quantity of marijuana in the larger bags, and are presumed to be familiar with small increments of weight, such as one ounce; a weight like one ounce is common in many contexts, such as calculating postage, weighing cooking ingredients, and so on.

Each of the larger, gallon-size, Ziploc bags contained approximately one ounce, or about 28.35 grams, by itself.  There were four to eight smaller baggies, each weighing approximately two grams.  The evidence before the jury was more than sufficient to support a finding that the quantity of marijuana found was well over 28.5 grams, and indeed was almost twice that amount.

## II.  The Evidence Was Sufficient to Establish Defendant's Knowledge and Possession of the Marijuana

Defendant next contends that the prosecution failed to meet its burden of proving that defendant knew about the marijuana in his apartment or that he had control of it.  We disagree.

Defendant's reliance on *People v. Antista* (1954) 129 Cal.App.2d 47 is misplaced.  There, the defendant was not at his apartment, but a codefendant and another person were present at the time of the search.  In a cupboard in the living room, officers found a wax paper bag containing some loose green leafy material, an ashtray with three cigarette

---

[1]  See the website for the National Institute of Standards and Technology (NIST), an agency of the United States Department of Commerce, for common conversion factors (from United States customary measures to metric measures for weight): <http://www.nist.gov/pml/wmd/metric/common-conversion-b.cfm> (as of Jan. 12, 2015). The NIST publishes a laminated card of metric conversions as publication NIST SP 365.

butts, and some packages of wheat straw paper. Inside a storeroom or unused bedroom, searchers also found a broken radio, inside which were secreted some wheat straw papers and a bandage tin containing a green leafy substance. (*Id*. at p. 48.) The defendant arrived home some time after the search. He denied any knowledge of the presence of marijuana or the other items found, and he stated that he had not used the storeroom or opened the radio for some months. He suffered from arthritis and could not breathe deeply, and he was a non-smoker. He had one key to the apartment, and customarily left it under the mat by the front door for the use of his friends, who frequently came there to watch television. (*Ibid*.) The codefendant, a woman, had been reclining on the couch when the officers came to execute the search; she was wearing a man's dressing gown over a slip when the officers entered. According to an officer, she said she had been staying at the apartment for about 10 days; she denied making that statement, but said she had stayed at the apartment the previous night. (*Id*. at pp. 48-49.) There was no evidence that the defendant had any previous connection with marijuana; on the other hand, the codefendant had a prior conviction for heroin use, although there were no needle marks on her arms showing recent heroin injection. (*Id*. at p. 49.) The appellate court reversed the defendant's conviction for possession of marijuana, holding that the evidence was insufficient to establish his knowledge of the marijuana in the apartment. The court stated that perhaps evidence of "substantially exclusive access" to the apartment would supply the required proof, but the evidence in that case showed non-exclusive possession of the apartment. If the defendant had given a false explanation for the presence of the

marijuana, or if he had made conflicting statements about the marijuana, such evidence might be sufficient. The defendant had made no such false or conflicting statements however. If the marijuana had been found in the defendant's personal effects, that could constitute "a potent circumstance indicating knowledge of its presence, ownership and control" (*id*. at p. 53), but that circumstance was not present. (*Ibid*.)

Here, defendant did testify that some of his friends had keys to his apartment, and that his friends would sometimes stay overnight. Defendant agrees that the prosecution's evidence "did not show that other people had access to [defendant's] apartment." But he contends that the evidence did not prove that defendant had "sole access," either.

In contrast to *Antista*, the evidence did not show occupancy of the apartment by anyone except defendant. The apartment was a small, one-bedroom apartment. Defendant's driver's license and college identification cards were inside, as well as his college textbooks. The marijuana was located on shelves in the kitchen, some of it next to a digital scale that defendant admitted was his. The evidence here supported a strong inference that defendant lived in the apartment alone, and that he had control of and full knowledge of its contents, including the marijuana.

### III.  The Probation Condition Is Not Unconstitutionally Vague

Defendant argues that the condition of his probation prohibiting him from possessing deadly weapons is infirm, as both vague and overbroad. The probation condition in question provided that defendant must not "knowingly own, possess, or have

10

under [his] control any firearm, deadly weapon, ammunition, or related paraphernalia for life."

Defendant's vagueness claim focuses on the "related paraphernalia" phrase; he contends that he "cannot possibly divine whether any number of everyday objects qualify as this type of paraphernalia." He complains, for example, that any "simple container in [his] residence . . . could be construed as paraphernalia related to ammunition because bullets could be placed inside." We conclude that defendant's vagueness objection is without merit.

A probation condition must be " 'sufficiently precise for the probationer to know what is required of him [or her], and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness. [Citation.]" (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.) Language that is otherwise "abstract" or "facially standardless" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116), must be construed in a specific context that may supply a sufficiently concrete context to permit a constitutional application of the probation condition. (*Ibid.*) In addition, reasonableness is the appropriate guideline; a probation term "will not be held void for vagueness 'if any reasonable and practical construction can be given to its language or if its terms may be made reasonably certain by reference to other definable sources.' " (*Id.* at p. 1117.)

Here, the phrase "related paraphernalia" appears in the context of a probation condition prohibiting knowing possession of deadly weapons. The term "paraphernalia,"

11

in this context, reasonably refers to paraphernalia "related" to deadly weapons. It would be manifestly unreasonable to interpret the condition to apply to "a virtually infinite number of otherwise innocent objects," such as simple containers, merely because bullets, for example, could be stored in them. Rather, the prohibition is reasonably applicable to objects that are identifiably weapons-related: e.g., holsters, ammunition straps, rifle scopes, wadding and black powder, and other similar items. As the People point out, defendant need not fear anything from being in possession of a Mason jar, merely because it could *potentially* hold bullets, but "if the jar is full of bullets, he should be concerned about the consequences if a probation officer appears at his residence." The possession of general-purpose storage containers, in itself, is not reasonably within the scope of the prohibition. The probation condition was not constitutionally vague.

IV. The Probation Condition Banning Possession of Weapons "For Life" Must Be Modified to Apply Only During the Term of Probation

Defendant's claim of overbreadth concerns the portion of the weapons probation condition, purporting to impose a ban on possession of weapons and related equipment "for life." The People agree, as do we, that the purported lifetime ban is improper, and that the probation condition should be modified to state that defendant shall not knowingly own or possess firearms, deadly weapons, ammunition or weapons-related paraphernalia for the duration of the probation period.

In imposing the lifetime restriction, the trial court referred in part to Penal Code section 29800, subdivision (a)(1) (former Pen. Code, § 12021). That provision prohibits

any person previously convicted of a felony from owning, purchasing, receiving or possessing a firearm. When a person has been convicted of a felony, Penal Code section 29810 requires that written notification of the firearms restriction must be given at the time of sentencing. However, Penal Code section 29800, subdivision (a)(1), applies only to firearms, and does not speak to other types of deadly weapons, or to weapons-related paraphernalia. Second, and more importantly, trial courts generally do not enforce penal laws by injunction, unless specifically authorized to do so by statute. (See *People v. E.W.A.P., Inc.* (1980) 106 Cal.App.3d 315, 320.) If, in the future, defendant should happen to violate Penal Code section 29800, subdivision (a)(1), by possessing a firearm, he can be charged and tried for that offense, but the court may not preemptively establish a lifetime injunction against such possession as an alternate means of enforcing the criminal law.

When the court imposes a sentence that is not authorized by statute, such error may be corrected on appeal. (*People v. Davis* (1981) 29 Cal.3d 814, 827, fn. 5.) Defendant's probation condition should be modified to limit its duration to the remainder of his probation period. That result may be achieved by striking the words "for life" from the weapons restriction condition of defendant's probation.

## DISPOSITION

The probation condition to which appellant objects is modified by deleting the words "for life." The superior court is directed to enter an order in the minutes that the probation condition read as follows: "Do not knowingly own, possess or have under your

13

control any firearm, deadly weapon, ammunition, or related paraphernalia (Pen. Code, [former] § 12021/18 U.S.C. § 922(g)(1))." In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                                J.

We concur:


RAMIREZ
                        P. J.


HOLLENHORST
                        J.