[No. C060490. Third Dist. June 29, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS JASON BEAVER, Defendant and Appellant.

COUNSEL

Thomas M. Singman, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Attorney General, Carlos A. Martinez, Catherine Tennant Nieto and Wanda Hill Rouzan, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HULL, J.—Defendant was convicted by a jury of one count of grand theft (Pen. Code, § 487, subd. (a); unspecified section references that follow are to this code), based on an incident in which he and two others staged an

accident at the ski resort where they worked in order to obtain medical treatment for a prior injury to defendant's knee and to collect a cash settlement. The jury also found that, in connection with the offense, defendant took property valued at more than $65,000 (§ 12022.6, subd. (a)(1)). Defendant was granted formal probation for a period of five years, ordered to serve one year in the county jail, and assessed victim restitution in the amount of $83,427.35, consisting of medical and legal fees paid by the ski resort in connection with the matter.

Defendant appeals. He contends the jury was not properly instructed on the elements of the offense or the enhancement, and there is insufficient evidence to support either finding by the jury. He also contends the trial court improperly included in victim restitution amounts paid by the ski resort in legal fees to resolve an insurance coverage issue.

We conclude the jury was not properly instructed on either the substantive offense or the enhancement, and reverse the conviction. We reject defendant's remaining contentions.

### FACTS AND PROCEEDINGS

During the ski season of 2003–2004, defendant worked for Sierra at Tahoe (SAT) ski resort. During the prior summer, SAT dug a percolation test hole at the resort approximately four to five feet deep and 72 feet from the "lower shop" where some of the SAT employees worked. The hole was in an area where SAT employees parked snowmobiles, but was not normally open to the public.

In December 2003, Brian P., an SAT employee, accidentally drove a snowmobile into the hole. Soon thereafter, the hole was filled in with snow and groomed over.

Ryan Minkler, Kevin Ritter, and Rebecca R. also worked for SAT during the 2003–2004 ski season. Minkler and defendant lived together in a house on Blitzen in South Lake Tahoe, and Ritter and Rebecca R. were at the house often.

Sometime in March, defendant, Minkler, and Rebecca R. were at the Blitzen residence discussing their frustration at being overworked and underpaid by SAT when the discussion turned to the percolation test hole. Minkler knew about the hole from the earlier snowmobile accident and was the first to mention the subject. They discussed the case of the woman who had been burned by hot coffee and recovered a settlement from McDonalds. Defendant

mentioned that he had previously torn an ACL in his knee, and it was suggested that defendant fall into the hole and then collect from SAT for his ACL tear.

The topic came up again during later discussions at the Blitzen residence, and defendant also discussed the scheme with Ritter. It was eventually agreed that defendant would fall into the hole, Ritter would be present to witness the fall and pull defendant out, and Minkler would be nearby to call the accident in to the ski patrol. Defendant promised to share any money he received from SAT with Minkler and Ritter.

Around the end of March or the first of April, Paul B., the lift operations manager of SAT and defendant's boss, told defendant he was not going to be invited back to work at SAT the next season. Sometime thereafter, at a social gathering, Paul overheard defendant say something like, "I'm going to get mine from SAT before I go."

April 9 was close to the end of the ski season at SAT. Near the end of the day, defendant told Minkler over the phone that he was going to go through with the plan. After defendant clocked out for the day, he, Minkler and Ritter met outside the lower shop where Minkler was working. Defendant and Ritter then began walking in the direction of a pub on the premises, which was also the direction of the hole. At some point, Ritter saw defendant tapping and stomping his foot on the snow. Ritter kept walking and, when he turned around, defendant was no longer in sight.

According to one SAT employee, when a hole is filled with snow and the snow begins to melt in the spring, the melting occurs from the bottom up. This creates a "snow bridge," which is a sheet of hardened snow over an open cavity.

After Ritter lost sight of defendant, he backtracked and found defendant lying in a pool of water at the bottom of a hole. There was a snow bridge over the hole two feet thick. Ritter called over to Minkler to get help. Minkler called the ski patrol and then came running over.

Defendant was pulled out of the hole and taken to a first aid station. He complained of pain in his knee and lower back and said he had been walking through the snow when he slipped into a hole. He was taken to a nearby hospital and later released.

Later that day, Minkler saw Rebecca R. and told her defendant had done it, had thrown himself into the hole.

Three days after the incident, defendant was examined by Dr. Terrence Orr, who concluded defendant had both a torn ACL and a torn and displaced medial meniscus in his left knee. Dr. Orr opined the torn ACL predated the April 9 incident. He performed surgery on defendant's knee on April 30.

At the time of the incident, SAT had general liability insurance with a deductible of $60,000 and workers' compensation insurance with a deductible of $250,000. SAT initially paid for all of defendant's medical expenses. SAT conducted an investigation of the matter to determine if it was covered by workers' compensation or general liability, eventually settling on the latter because defendant had been clocked out at the time of his fall. SAT incurred nearly $40,000 in legal bills, and over $44,000 in medical bills.

SAT later received information that the incident had been staged by defendant and refused to pay any more medical expenses. Defendant brought a civil action against SAT. Defendant demanded general damages of $400,000 plus lost earnings and future medical expenses.

Meanwhile, the police and the district attorney obtained information suggesting the April 9 incident had been staged to obtain money from SAT. Charges were brought against defendant for theft by embezzlement (§ 487, subd. (a)) and two counts of theft by fraud (§ 550, subds. (a)(1) & (6)). Defendant was also charged with an enhancement for having taken property over a certain value. (§ 12022.6, subd. (a).) The trial court later granted defendant's section 995 motion to dismiss the two theft by fraud charges.

Minkler and Ritter were also charged in the matter but received use immunity in exchange for their testimony in this matter. Both thereafter testified that the incident had been staged as part of a plan to obtain money from SAT. Rebecca R. also testified about the discussions she overheard regarding the plan to stage a fall at SAT.

Defendant testified in his own behalf and denied there was ever a plan to stage an accident. Defendant testified that on April 9, he met with Minkler and Ritter but they did not discuss him falling into the hole. Defendant claimed he did not even know about the hole.

Defendant was convicted of grand theft and found to have taken property valued in excess of $65,000. Defendant was thereafter granted formal probation for five years on the condition he spend one year in county jail. He was also ordered to pay victim restitution for medical expenses incurred by SAT in the amount of $44,356.36. After a followup hearing, defendant was ordered to pay further victim restitution for legal expenses incurred by SAT in the amount of $39,070.99.

DISCUSSION

I

*Sufficiency of the Evidence*

*(Grand Theft)*

Defendant contends there was insufficient evidence to support his conviction for grand theft. In particular, he argues there was insufficient corroboration of the testimony of his two accomplices, whose testimony was critical to the prosecution. Defendant acknowledges there is evidence placing him at the scene of the fall and showing his association with the accomplices, but he argues corroborating evidence must connect him to the actual commission of the offense and relate to some act or fact that is an element of the crime. Defendant points out there were no witnesses on the critical issue of intent. Although Rebecca R. gave corroborating testimony, defendant argues her testimony did no more than create suspicion against him.

We are not persuaded. In reviewing the sufficiency of the evidence supporting a conviction, we view the evidence in the light most favorable to the prosecution and determine if a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. (*People v. Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119].) We review the entire record, not isolated bits. (*People v. Valdez* (2004) 32 Cal.4th 73, 104 [8 Cal.Rptr.3d 271, 82 P.3d 296].) " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738], quoting *People v. Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].)

Section 1111 requires corroboration of accomplice testimony. It reads in relevant part: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." The purpose of this corroboration requirement is "to ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives." (*People v. Davis* (2005) 36 Cal.4th 510, 547 [31 Cal.Rptr.3d 96, 115 P.3d 417].)

"To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the

defendant with the crime charged' without aid or assistance from the accomplice's testimony." (*People v. Avila* (2006) 38 Cal.4th 491, 562–563 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) " 'The requisite corroboration may be established entirely by circumstantial evidence. [Citations.] Such evidence "may be slight and entitled to little consideration when standing alone." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704], quoting *People v. Miranda* (1987) 44 Cal.3d 57, 100 [241 Cal.Rptr. 594, 744 P.2d 1127].) It is sufficient that the corroborating evidence establish " ' "enough of the accomplice's testimony to establish his credibility." ' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128 [36 Cal.Rptr.2d 235, 885 P.2d 1], quoting *People v. Bunyard* (1988) 45 Cal.3d 1189, 1206–1207 [249 Cal.Rptr. 71, 756 P.2d 795].) However, while corroborating evidence need only be slight, "it is not sufficient to merely connect a defendant with the accomplice or other persons participating in the crime. The evidence must connect the defendant with the crime, not simply with its perpetrators." (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543 [248 Cal.Rptr. 60].)

In the present matter, there is more than enough corroborating evidence. Rebecca R. (who was not an accomplice) testified about the first conversation she overheard regarding the proposed scheme. Although she may have been mistaken about who was present at the time, her testimony closely matched that of Minkler as to what was said. Regarding the issue of intent, this is nearly always a matter of circumstantial evidence. Here, we have the fact the incident occurred near the end of the ski season, which was to be defendant's last season at SAT. We also have the fact the hole was located in an area where people do not normally walk. And despite the consensus that the presence and location of the hole was generally known to SAT employees, defendant denied knowing about it, thereby demonstrating a consciousness of guilt. Finally, there is the fact the accomplices and Rebecca R. testified defendant suggested he should be the one to fall into the hole because he had a preexisting knee injury, which is corroborated by the medical testimony that defendant had a preexisting ACL tear.

There is sufficient corroborating evidence to support the testimony of defendant's two accomplices. And the accomplice testimony is sufficient to support defendant's conviction.

II

*Sufficiency of the Evidence*

*(Enhancement)*

Defendant contends the evidence was insufficient to support the section 12022.6, subdivision (a), enhancement. At the time of the offense, that section

read: "(a) When any person takes, damages, or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows: [¶] (1) If the loss exceeds fifty thousand dollars ($50,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of one year." (Stats. 1998, ch. 454, § 2, p. 3231.) At the time of trial, the amount in section 12022.6, subdivision (a)(1), had been increased to $65,000. (Stats. 2007, ch. 420, § 1.)

Defendant argues that, while it might reasonably be argued he received the medical services paid for by SAT, "no reasonable claim can be made that he 'received' or 'obtained' the legal services SAT paid for to resolve its insurance issue." Therefore, defendant argues, the amount taken did not reach the threshold of former section 12022.6, subdivision (a)(1).

Defendant cites as support the general theft statute, section 484, which refers to stealing, taking, carrying, leading or driving away, or appropriating the property of another. He argues there is no evidence he stole, took, carried, led or drove away or fraudulently appropriated the legal fees. Defendant further argues his false or fraudulent representations about the accident did not defraud SAT out of money, labor or personal property as it relates to the legal fees.

Defendant further argues section 484 specifies the mode for calculating the value of property taken. It states: "In determining the value of the property obtained . . . , the reasonable and fair market value shall be the test, and in determining the value of services received the contract price shall be the test. If there be no contract price, the reasonable and going wage for the service rendered shall govern." (§ 484, subd. (a).) Defendant argues use of the terms "received" and "rendered" in the foregoing "conveys the clear sense that in order for a theft to have occurred, the defendant must have received the services at issue; they must have been rendered to him or her."

Defendant argues "[t]he clear sense of the theft statutes discussed above is that there is no crime as to services which the defendant has not received or obtained and which did not inure to his or her benefit." Likewise, calculation of the amount involved in a given theft is limited to what the defendant received, not what the victim lost.

The People contend "the focus of section 12022.6 is not on what [defendant] took, but the loss the victim incurred as a result of [defendant]'s taking." In support, they rely on section 1202.4 and the fact that victim restitution may include all losses incurred by the victim, whether or not those losses benefited the defendant.

In the present matter, there is no dispute regarding the facts associated with SAT's losses. Therefore, the question presented is one of law as to whether the legal fees incurred by SAT may be included in the calculation of the amount at issue for purposes of section 12022.6. This is a matter of statutory construction.

"The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. (*People v. Trevino* (2001) 26 Cal.4th 237, 240 [109 Cal.Rptr.2d 567, 27 P.3d 283]; *People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].) To determine legislative intent, we turn first to the words of the statute, giving them their usual and ordinary meaning. (*Trevino*, at p. 241; *Trope v. Katz* (1995) 11 Cal.4th 274, 280 [45 Cal.Rptr.2d 241, 902 P.2d 259].) When the language of a statute is clear, we need go no further. However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744 [38 Cal.Rptr.2d 650, 889 P.2d 970]; *People v. Woodhead* (1987) 43 Cal.3d 1002, 1007–1008 [239 Cal.Rptr. 656, 741 P.2d 154].)" (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 [14 Cal.Rptr.3d 857, 92 P.3d 350].)

When language of a penal provision is reasonably susceptible of two constructions, ordinarily the construction more favorable to the offender is adopted. (*People v. Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186].) This rule "aids in meeting the requirement that a defendant have fair warning of the consequences of his acts reflected in the constitutional prohibition against ex post facto laws." (*People v. Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288].) However, "[t]he rule of statutory interpretation that ambiguous penal statutes are construed in favor of defendants is inapplicable unless two reasonable interpretations of the same provision stand in relative equipoise, i.e., that resolution of the statute's ambiguities in a convincing manner is impracticable. [Citations.] '[A] rule of construction . . . is not a straitjacket. Where the Legislature has not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent.' " (*People v. Jones* (1988) 46 Cal.3d 585, 599 [250 Cal.Rptr. 635, 758 P.2d 1165].)

As noted above, section 12022.6, subdivision (a), provides for enhanced punishment where a defendant "takes, damages, or destroys any property in the commission or attempted commission of a felony, with the

intent to cause that taking, damage, or destruction." (§ 12022.6, subd. (a).) By its clear terms, this provision is not limited to theft-related offenses. It applies to any felony that causes a taking, damage or destruction of property. Furthermore, as to defendant's argument that the calculation of the value of property involved in the felony is limited to what the defendant received, rather than what the victim lost, this is incorrect. The inclusion of property that has either been "damage[d]" or "destroy[ed]" in the calculation demonstrates a clear intent that the emphasis is on what the victim lost, not what the defendant gained.

Nevertheless, the question is whether the phrase "takes, damages, or destroys" can fairly be interpreted to include the legal fees at issue here. We conclude it can. Even assuming as defendant does that all the legal fees were expended for the purpose of determining the insurance coverage issue, those expenses were for the purpose of reducing SAT's overall exposure to defendant's fraudulent scheme. As explained above, SAT had a general liability policy with a $60,000 deductible and a workers' compensation policy with a $250,000 deductible. Obviously, it was in SAT's interest to establish that this claim fell under the general liability policy. To the extent SAT expended legal fees in an effort to do this, those fees are inextricably intertwined with SAT's expenditures for medical care. In other words, expenses incurred in reducing SAT's exposure to medical expenses are every bit a part of those medical expenses.

Defendant contends there is insufficient evidence he intended the particular taking, damage or destruction at issue, i.e., SAT's expenditure of legal fees to resolve the insurance coverage issue. Again, we disagree. Defendant does not dispute there is sufficient evidence he intended to shake down SAT for his medical expenses and a monetary settlement in connection with the staged accident. SAT's risk manager testified defendant asked for $400,000 in general damages, $6,000 in lost wages, and $40,000 in future medical benefits, in addition to what defendant had already received. As explained above, the legal expenses were incurred in an attempt to limit SAT's exposure. It does not matter that defendant may not have foreseen this particular type of loss to SAT, any more than it mattered whether defendant foresaw that SAT would defend against his civil claims rather than accede to his demands. These were expenses that naturally flowed from defendant's criminal conduct. We are aware of no requirement that a defendant intend the specific expenses incurred, as long as he intended to take, damage or destroy the victim's property in some way.

Substantial evidence supports the jury's true finding on the section 12022.6 enhancement.

## III

### Grand Theft Instruction

■ Defendant contends the jury was not properly instructed on the substantive theft offense. Defendant was charged with grand theft under former section 487, which, at the time of the offense, included "theft" of property valued at more than $400. (Former § 487, subd. (a); Stats. 1993, ch. 1125, § 5, p. 6292.) "Theft," in turn, is defined in section 484 as follows: "(a) Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft. . . ."

The jury was given the following theft instruction: "The Defendant is charged in Count I with grand theft. [¶] To prove the Defendant is guilty of this crime the People must prove, one, the Defendant took possession of property owned by someone else; two, the defendant took the property without the owner or the owner's agent's consent; three, when the Defendant took the property, he intended to deprive the owner of the property; and, four, the Defendant moved the property even a small distance and kept it for a period of time, however great."

The foregoing instruction, taken from CALCRIM No. 1800, defines the offense of theft by larceny. "The elements of theft by larceny are well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away. [Citations.] The act of taking personal property from the possession of another is always a trespass unless the owner consents to the taking freely and unconditionally or the taker has a legal right to take the property. [Citation.] The intent to steal or *animus furandi* is the intent, without a good faith claim of right, to permanently deprive the owner of possession. [Citation.] And if the taking has begun, the slightest movement of the property constitutes a carrying away or asportation." (*People v. Davis* (1998) 19 Cal.4th 301, 305 [79 Cal.Rptr.2d 295, 965 P.2d 1165], fns. omitted.)

Defendant contends a larceny instruction was not appropriate under the circumstances of this case, because the evidence, when viewed in the light

most favorable to the prosecution, tended to prove he "faked an accident with the intent to acquire medical services and damages from SAT." Defendant argues such conduct is not larceny but theft by false pretenses, as defined in section 532. Subdivision (a) of section 532 reads: "Every person who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of money, labor, or property, whether real or personal, . . . is punishable in the same manner and to the same extent as for larceny of the money or property so obtained." Subdivision (b) contains the following additional requirement: "[T]he defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing, unless the pretense, or some note or memorandum thereof is in writing, subscribed by or in the handwriting of the defendant, or unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances."

Defendant contends the trial court was required to instruct the jury on theft by false pretenses, as provided in CALCRIM No. 1804. That instruction reads in relevant part:

"The defendant is charged [in Count __] with [grand/petty] theft by false pretense [in violation of Penal Code section 484].

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant knowingly and intentionally deceived a property owner [or the owner's agent] by false or fraudulent representation or pretense;

"2. The defendant did so intending to persuade the owner [or the owner's agent] to let the defendant [or another person] take possession and ownership of the property;

"AND

"3. The owner [or the owner's agent] let the defendant [or another person] take possession and ownership of the property because the owner [or owner's agent] relied on the representation or pretense.

"You may not find the defendant guilty of this crime unless the People have proved that:

"[A. The false pretense was accompanied by either a writing or false token(;/.)]

"[OR]

"[(A/B). There was a note or memorandum of the pretense signed or handwritten by the defendant(;/.)]

"[OR]

"[(A/B/C). Testimony from two witnesses or testimony from a single witness along with other evidence supports the conclusion that the defendant made the pretense.]"

Defendant argues the instruction given by the court failed to inform the jury it had to find he "knowingly and intentionally deceived SAT by a false or fraudulent representation or pretense"; "he did so intending to persuade SAT to let him take possession and ownership of SAT's property"; and SAT relied on the representation or pretense. According to defendant, the jury was permitted to convict him on a finding he intended to deprive SAT of property but without also finding he intended to take possession of the property in the first place or that SAT relied on defendant's representation or pretense. The jury also was not required to consider whether the facts fit the definition of a false pretense or to find the necessary corroboration.

■ We agree with defendant the instruction given by the court did not fit the crime alleged. Notwithstanding the fact the offense of theft by false pretenses, like all other theft offenses, has been consolidated into the single crime of theft as defined in section 484, the essential elements of the individual theft offenses remain the same. (*People v. Davis, supra,* 19 Cal.4th at pp. 304–305.) The present matter did not involve a taking of property from another without his consent. SAT willingly paid for defendant's medical treatment on the false representation that SAT had caused defendant's injuries. This was theft by false pretenses, not larceny.

■ The People contend the trial court was not required to instruct on theft by false pretenses, because the prosecution chose to proceed on a theory of theft by embezzlement. However, the present matter does not involve embezzlement, which is defined in section 503 as "the fraudulent appropriation of property by a person to whom it has been intrusted." The elements of theft by embezzlement are the owner entrusted property to the defendant, the owner did so because he or she trusted the defendant, the defendant fraudulently converted the property for his or her own benefit and, in doing so, the defendant intended to deprive the owner of its use. "The crime of embezzlement requires the existence of a 'relation of trust and confidence,' similar to a fiduciary relationship, between the victim and the perpetrator." (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1845 [52 Cal.Rptr.2d 765].)

In the present matter, there is no evidence defendant was in a position of trust with SAT giving him access to property that he appropriated for his own benefit. The evidence showed defendant induced SAT to turn over its property to him or for his benefit in reliance on defendant's implicit or explicit assertion that he had been injured due to the fault of SAT. This is a case of theft by false pretenses.

The People contend the court properly instructed the jury on two theories of theft that were consistent with the evidence: (1) theft by larceny, and (2) theft by an employee. According to the People, the instructions on these two theories "adequately covered the prosecutor's theory of theft by embezzlement." In particular, the People argue, the instruction on theft by larceny (CALCRIM No. 1800) "directed the jurors that [defendant] was guilty of grand theft if he took possession of property owned by someone else without that person's consent, and he intended to permanently deprive the owner of the property." The People further argue the instruction on theft by an employee (CALCRIM No. 1803) "directed the jurors that [defendant] was guilty of grand theft under this theory if, as an employee of SAT, he committed theft of property or services from SAT and the combined value of the property or services that [defendant] obtained during a period of 12 consecutive months was $400 or more."

Finally, the People argue the consolidation of all theft offenses into the single crime of theft in section 484 means the precise theory utilized by the prosecution does not matter as long as the evidence supports the elements of at least one of the consolidated offenses. The People argue this is such a case, explaining: "Here, the evidence supported both of the instructions on theft given by the court. By staging a false accident on SAT's property, [defendant] was able to obtain money from SAT when SAT paid his medical bills. [Defendant's] civil lawsuit evidenced his intent to permanently deprive SAT of its money. This proof supported the court's instructions pursuant to CALCRIM No. 1800. In addition, evidence that [defendant] was a SAT employee and took money from SAT by staging a false accident, filing a false claim, and obtaining over $400 from SAT over a period of 12 consecutive months, supported the court's instructions under CALCRIM No. 1803."

█ The People misread the instructions given. The first instruction (CALCRIM No. 1800) defines theft by larceny. It requires, among other things, that the defendant had taken possession of another's property and moved it, even a small distance, and kept it for at least a brief time. This instruction applies to situations where a defendant physically takes property from another's actual or constructive possession. That is not the case here. Defendant did not take SAT's property. SAT gave it to defendant under the false pretense that defendant had been injured due to the fault of SAT.

■ As for the theft by employee instruction, this is not an alternate theory of theft but an alternate theory of *grand* theft. In other words, once a theft has been found, the jury was given two alternatives for finding it was grand rather than petty theft. First, the jury was instructed under CALCRIM No. 1801 that it could find the theft was grand theft if the property stolen was worth more than $400. However, in the case of an employee who steals a series of smaller amounts, each less than $400 but cumulatively more than $400, the jury was instructed under CALCRIM No. 1803 that it could accumulate those thefts to meet the threshold amount.

On the People's argument the precise theory on which the jury was instructed does not matter as long as the evidence supports the elements of at least one of the consolidated theft offenses, this is answered by *People v. Curtin* (1994) 22 Cal.App.4th 528 [27 Cal.Rptr.2d 369] (*Curtin*), an opinion of Justice Werdegar. *Curtin* concerned the interplay of theft by trick, which involves the voluntary relinquishment of possession of property by the owner due to some trick or device, and theft by false pretenses, which involves the voluntary relinquishment of both possession and title of property by the owner. In *Curtin*, the defendant cashed a check written out to another using a false identification and a forged signature and was convicted of grand theft. (*Id.* at p. 530.) The jury was instructed on theft by trick and device rather than theft by false pretenses. The Court of Appeal reversed the conviction, because "[t]here was no evidence the bank teller intended to surrender to defendant only possession and not title to the money." (*Id.* at p. 531.)

■ The court explained that "[w]hile a general verdict of guilt may be sustained on evidence establishing any one of the consolidated theft offenses [citations], the offense shown by the evidence must be one on which the jury was instructed and thus could have reached its verdict." (*Curtin, supra*, 22 Cal.App.4th at p. 531.) According to the court, "if the elements of theft by trick were not proven, the conviction cannot be affirmed on the ground the evidence showed defendant's guilt of false pretenses, which has additional required substantive elements, as well as a special corroboration requirement, upon which the jury was not instructed [citation]." (*Ibid.*)

The People contend the present matter is distinguishable from *Curtin*. According to the People, in *Curtin* the evidence did not support the type of theft on which the jury was instructed, whereas here "the court's instructions did support the theft committed by [defendant]."

We disagree. As explained above, the theory on which the jury was instructed was one in which the defendant takes possession of another's property without the owner's consent. In this case, defendant gained the property of SAT, i.e., its money to pay for medical treatment, *with* SAT's

consent. It was that very consent that makes this a case of false pretenses. However, the jury was not instructed on the elements of theft by false pretenses as described above. The jury therefore had no occasion to decide if those elements had been satisfied.

The People take issue with the statement in *Curtin* that the offense shown by the evidence must be one on which the jury was instructed. They cite *People v. Counts* (1995) 31 Cal.App.4th 785 [37 Cal.Rptr.2d 425] (*Counts*), where the court characterized that statement as dictum and further indicated: "We interpret the *Curtin* dictum as meaning that there may be a technical error when the particular theory of theft upon which the jury is instructed turns out to be the wrong one. However, neither *Curtin* nor any decision cited therein actually holds there is a rule of per se reversal in such circumstances." (*Id.* at p. 792.)

In *Counts*, the defendant was convicted of grand theft by false pretenses stemming from his actions in ordering lumber on credit for a nonexistent project and then reselling the lumber to a codefendant. (*Counts, supra,* 31 Cal.App.4th at pp. 787–788.) The Court of Appeal affirmed the conviction, notwithstanding the fact the victim had retained a security interest in the property obtained by the defendant. The court concluded sufficient title had passed to the defendant to support the theft by false pretenses charge rather than a charge of theft by trick. (*Id.* at p. 791.)

Obviously, *Counts* does not contradict *Curtin*. In *Counts*, the court found the evidence supported the offense on which the jury was instructed. The discussion of *Curtin* in *Counts* was therefore itself dictum. The court was explaining why the conviction would have been upheld even if the offense proved by the evidence had been theft by trick, on which the jury was not instructed, rather than theft by false pretenses.

Furthermore, *Counts* is easily distinguished from *Curtin*. In *Counts*, the defendant argued the evidence showed theft by trick, because title had not passed to the defendant, whereas the jury was instructed on theft by false pretenses. The court concluded that even if theft by false pretenses was not established because of the security interest, theft by trick was satisfied, inasmuch as the elements of the latter are subsumed within the former except for the passing of title. In other words, if the evidence established all the elements of theft by false pretenses except that title had not passed to the defendant, then the elements of theft by trick were met.

But in *Curtin*, when the court concluded the evidence did not meet the requirements of theft by trick because both possession and title had passed to the defendant, the court could not fall back on the offense of theft by false

pretenses. Even if there was sufficient evidence in the record to support the additional elements required for theft by false pretenses, the jury was not instructed on the latter offense and therefore had no occasion to determine if the additional elements had been proved beyond a reasonable doubt.

In the present matter, the instructions read to the jury did not include all the elements necessary for a charge of theft by false pretenses. Therefore, even if there was sufficient evidence in the record to support such a charge, the failure to instruct on those elements violated defendant's constitutional rights to have the charges decided by a jury.

The People contend any error in this regard was harmless beyond a reasonable doubt. They argue the evidence here that defendant staged an accident in order to hold SAT liable for his medical treatment is overwhelming. Therefore, they argue, failure to instruct the jury under CALCRIM No. 1804 made no difference to the outcome of the case.

We cannot agree. The primary witnesses against defendant were his two accomplices, each of whom testified under a deal whereby they walked away free and clear in exchange for their testimony. Although another witness, Rebecca R., testified about the discussions at the Blitzen residence, she also indicated she thought the others were only joking. Furthermore, Rebecca did not come forward until two years after the fact.

In *People v. Traster* (2003) 111 Cal.App.4th 1377 [4 Cal.Rptr.3d 680], as in *Counts*, the jury was instructed on theft by false pretenses whereas the evidence arguably showed theft by trick or device. The *Traster* court found this error to be "merely a technical one in which the jury was instructed on a particular theory of theft which turned out to be the wrong one." (*Traster*, at p. 1389.) The court continued: "This is particularly so in this case where the instructional error 'caused the People to carry the unnecessary burden of proving [the additional element] of corroboration in order to establish false pretenses.' " (*Id.* at pp. 1389–1390, fn. omitted.)

In the present matter, we do not have merely a technical error. Under the theory on which the jury was instructed, the prosecution was not required to carry an unnecessary burden. The prosecution was not required to prove either a representation by defendant on which SAT relied or corroboration. Thus, even if there was evidence in the record to support these elements, the jury was never called upon to determine if they had been established beyond a reasonable doubt. Under these circumstances, we cannot say the error did not contribute to the guilty verdict. The conviction for grand theft must therefore be reversed.

IV

*Enhancement Instruction*

Having concluded the underlying conviction must be reversed for instructional error, the rest of the judgment is likewise nullified. However, for the benefit of the parties in the event of retrial, we consider defendant's remaining contentions on appeal.

The jury was instructed on the section 12022.6 enhancement as follows: "If you find the Defendant guilty of the crime charged in Count I, you must then decide whether the People proved the additional allegation that the Defendant took property valued at more than $65,000. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find the allegation has not been proved."

Defendant contends this instruction, which was patterned after the general enhancement instruction, CALCRIM No. 3250, failed to include a recitation of the elements of the enhancement. CALCRIM No. 3220, which the court did not give and which is specific to section 12022.6, lists the elements as: "1. In the commission [or attempted commission] of the crime, the defendant (took[,]/ [or] damaged[,]/ [or] destroyed) property; [¶] 2. When the defendant acted, (he/she) intended to (take[,]/ [or] damage[,]/ [or] destroy) the property; [¶] AND [¶] 3. The loss caused by the defendant's (taking[,]/ [or] damaging[,]/ [or] destroying) the property was greater than $___ <*insert amount alleged*>." Defendant argues "the jury was never instructed that in order to find the enhancement allegation true, they had to find that when [defendant] acted, he intended to take the property alleged to be the subject of the theft, including amounts attributable to SAT's legal bills."

██  The People contend defendant forfeited this issue for purposes of appeal by failing to object to the instruction below. However, assuming it is possible to forfeit such an issue, it is beside the point. The enhancement cannot exist independently of the substantive crime, which we have reversed. Thus, defendant will have an opportunity to rectify the situation in the event of retrial.

The People contend other instructions given by the court properly informed the jury of the elements of the enhancement. In particular, the jury was instructed on the elements of the offense of grand theft as follows: "To prove the Defendant is guilty of this crime the People must prove, one, the Defendant took possession of property owned by someone else; two, the defendant took the property without the owner or the owner's agent's consent; three, when the Defendant took the property, he intended to deprive

the owner of the property; and, four, the Defendant moved the property even a small distance and kept it for a period of time, however great. [¶] If you conclude the Defendant committed a theft, you must decide whether the crime was grand theft or petty theft. [¶] The Defendant committed grand theft if he stole property or services worth more than $400. All other theft is petty theft."

The jury was also instructed on theft by an employee and, in particular, on how to determine whether there was one grand theft or multiple petty thefts: "To prove the Defendant is guilty of a single grand theft the People must prove that: the Defendant was an employee at SAT; two, the Defendant committed theft of property or services from SAT; and, three, the combined value of the property or services the Defendant obtained during the period of 12 consecutive months was $400 or more. [¶] If you conclude the People have failed to prove grand theft, any multiple thefts you have found proven are petty thefts."

Even assuming the foregoing instructions satisfied the other elements for the section 12022.6 enhancement, there was no mention of the requirement that the jury find the property taken was valued in excess of $65,000. Thus, the jury was not properly instructed on all the elements of the enhancement. This too was error.

V

*Victim Restitution*

At all times relevant to this matter, former section 1202.4 provided in relevant part: "(a)(1) It is the intent of the Legislature that a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime. [¶] . . . [¶] (f) In every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (Stats. 2004, ch. 223, § 2.)

"The standard of review of a restitution order is abuse of discretion. 'A victim's restitution right is to be broadly and liberally construed.' [Citation.] ' "When there is a factual and rational basis for the amount of restitution ordered by the court, no abuse of discretion will be found by the reviewing court." ' [Citations.]" (*In re Johnny M.* (2002) 100 Cal.App.4th 1128, 1132 [123 Cal.Rptr.2d 316].)

At trial, SAT's risk manager testified that SAT had both general liability and workers' compensation insurance and an issue arose as to which policy would cover defendant's injury. When asked how much SAT paid to resolve that issue, the risk manager testified: "The last time I looked at the file, we were over $40,000 in legal bills, and the medicals were $44,000 and some change." He further testified SAT chose to treat defendant's injury as a general liability matter because, at the time of the accident, defendant was off the clock.

The probation report indicated SAT's general manager reported that SAT paid all of defendant's medical bills from the beginning. The general manager claimed the total loss incurred by SAT was $83,427.35, consisting of $44,356.36 in medical expenses and $39,070.99 in legal fees. The trial court ordered victim restitution in the amount of $83,427.35.

Defendant contends the trial court erred in including legal expenses in the computation of victim restitution. He argues that while SAT may have incurred legal expenses to defend the civil action he filed against it, the only evidence presented at trial was the testimony of SAT's risk manager, who indicated SAT incurred over $40,000 in legal expenses *to resolve the insurance coverage issue*. Defendant argues such legal fees "were incurred in an unnecessary exercise to resolve an internal legal issue that did not need resolution." According to defendant, SAT concluded from the very start that the accident was covered by general liability rather than workers' compensation, so no legal controversy existed. Defendant further argues it did not matter which insurance policy applied in any event, because the total medical expenses paid out by SAT were less than the deductible under either policy.

There are several problems with defendant's arguments. First, it is not altogether clear from the record the legal expenses were incurred to resolve the insurance issue. Although SAT's risk manager was asked how much SAT paid to resolve the liability issue, he answered: "The last time I looked at the file, we were over $40,000 in legal bills . . . ." This is not a direct response to the question. It appears to be more a statement that, to date, SAT had incurred over $40,000 in legal expenses for all legal work done in the case. Presumably, this would include legal work in defending the civil action filed by defendant. Similarly, SAT's general manager reported that a total of $39,070.99 had been paid in legal fees. Again, there is no differentiation between fees incurred on the insurance issue and fees incurred in the civil action.

Defendant argues legal expenses incurred to resolve the insurance coverage issue were unnecessary, inasmuch as SAT resolved that issue soon after the incident. However, this argument assumes the legal expenses incurred on the

insurance issue were for legal research of the issue in order for SAT to reach an internal decision. But this ignores the fact there were two other parties who would be impacted by SAT's decision, the workers' compensation insurer and the general liability insurer. There is no reason to conclude the legal expenses incurred on the insurance issue were for an internal determination alone rather than for the purpose of resolving a dispute with the insurers.

At any rate, defendant's argument assumes that if the legal expenses were incurred to resolve an internal insurance issue, where SAT had already decided that issue, those expenses may not be included in a victim restitution order. However, it was defendant's criminal conduct that put in motion a series of events that ended up costing SAT a significant amount of money, including legal fees to resolve how defendant's medical expenses would be paid. Defendant does not dispute that SAT did, in fact, incur those expenses. Nor does defendant contend the expenses were not associated with his criminal conduct.

"[T]he trial court is vested with broad discretion in setting the amount of restitution; it may ' "use any rational method of fixing the amount of restitution which is reasonably calculated to make the victim whole . . . ." ' " (*People v. Tucker* (1995) 37 Cal.App.4th 1, 6 [44 Cal.Rptr.2d 1].) "Thus, while the amount of restitution cannot be arbitrary or capricious, '[t]here is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action. . . .' [Citation.]" (*People v. Ortiz* (1997) 53 Cal.App.4th 791, 800 [62 Cal.Rptr.2d 66].) "In determining the amount of restitution, all that is required is that the trial court 'use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious.' [Citations.] The order must be affirmed if there is a factual and rational basis for the amount." (*People v. Akins* (2005) 128 Cal.App.4th 1376, 1382 [27 Cal.Rptr.3d 815].)

Because it is not disputed SAT incurred the legal expenses as a result of defendant's criminal conduct, the trial court reasonably concluded reimbursement of such expenses would be necessary to make SAT whole.

Defendant contends the amount claimed for legal expenses is nevertheless unreasonable. However, defendant did not challenge the amount of the fees below. His challenge was to the propriety of awarding legal expenses as restitution. Had defendant challenged the reasonableness of the fees, the prosecution would have had an opportunity to present further evidence on the issue. Defendant has therefore forfeited the issue for purposes of appeal. (Accord, *People v. Whisenand* (1995) 37 Cal.App.4th 1383, 1395–1396 [44 Cal.Rptr.2d 501].)

Finally, on defendant's argument the legal expenses were unnecessary, because the total medical expenses were less than the deductible under either policy, this assumes SAT knew what its total exposure would be. But it did not. In fact, defendant made a claim on SAT in an amount exceeding $400,000.

We find no abuse of discretion in the award of victim restitution.

### DISPOSITION

The conviction for grand theft and the true finding on the associated enhancement are reversed.

Sims, Acting P. J., and Raye, J., concurred.